SIMPSON THACHER & BARTLETT LLP
Harrison J. Frahn IV (CA Bar No. 206822)
hfrahn@stblaw.com
Jason M. Bussey (CA Bar No. 227185)
jbussey@stblaw.com
2475 Hanover Street
Palo Alto, California  94304
Telephone: (650) 251-5000
Facsimile: (650) 251-5002

SIMPSON THACHER & BARTLETT LLP
Peter C. Thomas (*pro hac vice* application forthcoming)
pthomas@stblaw.com
Janet M. Whittaker (*pro hac vice* application forthcoming)
janet.whittaker@stblaw.com
900 G Street, N.W.
Washington, D.C. 20001
Telephone: (202) 636-5500
Facsimile: (202) 636-5502

*Attorneys for Petitioner Apple Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| APPLE INC.,<br><br>                              Petitioner,<br><br>vs.<br><br>BYD PRECISION MANUFACTURING CO., LTD. AND BYD COMPANY LIMITED,<br><br>                              Respondents. | Case No. 3:15-cv-04985<br><br>**MOTION TO COMPEL ARBITRATION AND FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date:<br>Time:<br>Judge: |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 2

    I.   THE PARTIES .......................................................................................................... 2

    II.  THE MASTER DEVELOPMENT AND SUPPLY AGREEMENTS ................................. 3

        A.  The Non-Assert Agreement ............................................................................ 4

        B.  The 2014 MDSA Provides for Disputes Among the Parties to be Resolved by Arbitration ..................................................................................................... 5

    III. THE CHINESE PATENT LITIGATION ........................................................................ 5

ARGUMENT ...................................................................................................................... 7

    I.   THIS COURT SHOULD COMPEL RESPONDENTS TO ARBITRATE THE PARTIES' DISPUTE ARISING UNDER THE 2014 MDSA ............................................ 7

    II.  THIS COURT SHOULD ISSUE AN ANTI-SUIT INJUNCTION PROHIBITING BYD FROM PROSECUTING THE CHINESE PATENT LITIGATION PENDING THE OUTCOME OF THE ICC ARBITRATION ........................................... 11

        A.  Legal Standard for an Anti-Suit Injunction ................................................... 11

        B.  The Parties and Issues Are the Same in the U.S. Action and the Chinese Patent Litigation ......................................................................................... 12

        C.  The Chinese Patent Litigation Frustrates This Court's Policies Favoring Forum Selection Provisions, Including Arbitration Agreements ............................ 15

        D.  This Contract Dispute Between Private Parties Has No Effect on Comity .................. 15

        E.  Apple Will Be Irreparably Harmed if Forced to Defend the Chinese Patent Litigation ................................................................................................... 16

CONCLUSION .................................................................................................................. 18

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Bureau of Shipping v. Tencara Shipyard* S.P.A.,
  170 F.3d 349 (2d Cir. 1999) ................................................................ 11

*Applied Med. Distrib. Corp. v. Surgical Co.*,
  587 F.3d 909 (9th Cir. 2009) ............................................... 12,13,15,16

*Balen v. Holland America Line, Inc.*,
  583 F.3d 647 (9th Cir.2009) ................................................................. 8

*Belize Soc. Dev. Ltd. v. Gov't of Belize*,
  794 F.3d 99 (D.C. Cir. 2015) ............................................................... 8

*Carnival Cruise Lines, Inc. v. Shute*,
  499 U.S. 585 (1991). ......................................................................... 15

*Comer v. Micor, Inc.*,
  436 F.3d 1098 (9th Cir. 2006) ............................................................. 9

*Dean Witter Reynolds v. Byrd*,
  470 U.S. 213 (1985) ........................................................................... 8

*E. &. J. Gallo Winery v. Andina Licores S.A.*,
  446 F.3d 984 (9th Cir. 2006) ............................................... 11,12,15,16

*Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*,
  441 F. Supp. 2d 552 (S.D.N.Y. 2006).equ ........................................ 12

*Freaner v. Valle*,
  No. 11CV1819 JLS MDD, 2011 WL 5596919 (S.D. Cal. Nov. 17,
  2011) ................................................................................................ 9

*Grigson v. Creative Artists Agency LLC*,
  210 F.3d 524 (5th Cir. 2000) ............................................................. 10

*In re Unterweser Reederei GMBH*,
  428 F.2d 888 (5th Cir. 1970) ........................................................ 12,15

*InterDigital Tech. Corp. v. Pegatron Corp.*,
  No. 15-02584, 2015 WL 3958257 (N.D. Cal. June 28, 2015). ............. 16

*Legacy Wireless Servs., Inc. v. Human Capital, LLC*,
  314 F. Supp. 2d 1045 (D. Or. 2004 .................................................... 11

*Letizia v. Prudential Bache Secs., Inc.*,
  02 F.2d 1185 (9th Cir.1986) ............................................................... 9

*Medtronic, Inc. v. Catalyst Research Corp.*,
  518 F. Supp. 946 (D. Minn. 1981). .................................................... 14

*Microsoft Corp. v. Motorola, Inc.*,
  696 F.3d 872 (9th Cir. 2012) ............................................... 13,14,15,16

*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth*,
   473 U.S. 614 (1985) .................................................................................. 8

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983) ...................................................................................... 8

*Prograph Intern. Inc. v. Barhydt*,
   928 F. Supp. 983 (N.D. Cal. 1996) ........................................................... 8

*Seattle Totems, Etc. v. Nat'l Hockey League*,
   652 F.2d 852 (9th Cir. 1981)..................................................................... 11

*Simula, Inc. v. Autoliv, Inc.*,
   175 F.3d 716 (9th Cir. 1999)..................................................................... 8

*Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l,
   Inc.*,
   198 F.3d 88 (2d Cir. 1999) ........................................................................ 9

*Toyo Tire Holdings of Ams., Inc. v. Cont'l Tire N. Am., Inc.*,
   609 F.3d 975 (9th Cir. 2010)..................................................................... 11

*Wood v. Penntex Res. LP.*,
   322 F. App'x 410 (5th Cir. 2009).............................................................. 10

*Wood v. PennTex Res.*,
   L.P., 458 F. Supp. 2d 355 (S.D. Tex. 2006) ....................................... 10,11

*Zurich Am. Ins. Co. v. Cebcor Servs. Corp.*,
   No. 02 C 2283, 2003 WL 21418237 (N.D. Ill. June 18, 2003).............. 9-10

*Zynga, Inc. v. Vostu, USA, Inc.*,
   816 F. Supp. 1d 824 (N.D. Cal. 2011). ............................................... 12,13

**Statutes**

9 U.S.C. § 202 ........................................................................................... 7

9 U.S.C. § 203 ........................................................................................... 7

9 U.S.C. § 206 ........................................................................................... 7

1      <u>NOTICE OF MOTION AND MOTION</u>

2            PLEASE TAKE NOTICE that on December 4, 2015, or as soon thereafter as the

3     matter may be heard, in the courtroom of the judge assigned to the concurrently filed Petition,

4     located at 450 Golden Gate Avenue, San Francisco, CA 94102, the undersigned Petitioner Apple

5     Inc. ("Apple") will and hereby does move for the relief described below.

6            Apple seeks:  (i) an order compelling Respondents BYD Precision Manufacturing

7     Co., Ltd. ("BYD Precision") and BYD Company Limited ("BYD") to arbitrate the parties'

8     dispute regarding the non-assert agreement set forth in the 2014 Master Development and Supply

9     Agreement (the "2014 MDSA"), which requires all disputes arising out of or relating to that

10    agreement to be arbitrated under the Rules of Arbitration of the International Chamber of

11    Commerce ("ICC") in San Francisco, California; and (ii) a preliminary injunction in aid of the

12    arbitration by enjoining Respondent BYD from continuing, until an arbitral tribunal has resolved

13    Apple's claims under the 2014 MDSA, the patent claims improperly commenced by BYD against

14    Petitioner's indirect subsidiary, Apple Electronic Products Commerce (Beijing) Co., Ltd., Yitian

15    Shenzhen Branch ("Apple Beijing") and other defendants, in the Shenzhen Intermediate People's

16    Court (the "Chinese Patent Litigation").  This Motion is based on this Notice of Motion, the

17    following Memorandum of Points and Authorities, the Declaration of Mattia Pascolini in Support

18    of Apple's Motion to Compel Arbitration and for Preliminary Injunction ("Pascolini Decl."), the

19    declaration of Jason M. Bussey ("Bussey Decl."), the files in these actions, the argument of

20    counsel, and such other matters as the Court may consider.

21                            **<u>INTRODUCTION</u>**

22            This action arises out of the relationship between Apple and a significant China-

23    based multinational corporation, Respondent BYD and its subsidiary Respondent BYD Precision,

24    which Apple, until recently, considered to be trusted supply chain partners.  Apple and BYD's

25    cooperation takes place pursuant to several agreements, including two Master Development and

26    Supply Agreements ("MDSAs") dated 2011 and 2014.

27            Section 13.2(e) of the 2014 MDSA contains a vital protection for Apple, namely,

28    an explicit "Non-Assert" provision under which BYD Precision and all "Related Entities"—

which include its parent BYD—commit not to pursue any claims for infringement of intellectual property rights.  The non-assert provision operates explicitly for the benefit of Apple and its "Related Entities," including Apple Beijing, as well as Apple's suppliers and distributors.

In April 2015, BYD breached both Apple's trust and BYD's express contractual obligations by suddenly and groundlessly filing two intellectual property suits in a court in Shenzhen, China.[1]  In these actions, BYD asserts patent infringement claims not only against an Apple affiliate, Apple Beijing, but also against four Apple suppliers and an Apple distributor that form an essential link in Apple's Chinese supply chain.  BYD's pursuit of these patent infringement claims in the Chinese court also constitutes a breach by BYD Precision of its obligation to guarantee BYD's performance of its agreement not to assert such claims.

As a result of the Chinese patent litigation and in order to protect itself, on October 23, 2015, Apple commenced an arbitration against BYD and BYD Precision pursuant to the arbitration agreement in the 2014 MDSA (the "ICC Arbitration").  Apple has been constrained to bring this proceeding to compel arbitration and to obtain injunctive relief in aid of the ICC Arbitration in order to avoid rendering moot the decision of the arbitral tribunal, to protect its supply chain, and to avoid irreparable harm to Apple's goodwill and reputation and major disruption to Apple's business operations.


## STATEMENT OF FACTS

**I.    THE PARTIES**

Petitioner Apple is a corporation organized under the laws of California, with its principal place of business at 1 Infinite Loop, Cupertino, California 95014, United States.  Apple is a leading personal technology company, offering innovative hardware devices such as the iPhone, the iPad, the Mac, and Apple Watch.  Apple's three software platforms—iOS, OS X, and watchOS—provide seamless experiences across these devices and offer users additional services including the App Store, Apple Music, Apple Pay, and iCloud.

---

[1]    BYD did not serve the complaints in these cases until July 2015.

1    Respondent BYD Precision is a company organized and existing under the laws of

2    China, with its principal place of business at No. 3001 Baohe Road, Baolong Industrial Town,

3    Longgang Shenzhen, 518117, China.  Respondent BYD is a corporation organized and existing

4    under the laws of China, with its principal place of business at No. 3001 Hengping Road,

5    Pingshan, Shenzhen, 518118 China.  BYD is the parent and controlling shareholder of BYD

6    Precision, in which it holds an indirect interest of approximately 65.76%.  Bussey Decl. Ex. C

7    (BYD Annual Report) at 88.

8    BYD and its subsidiaries are engaged in three major businesses:  (i) automobiles,

9    including traditional fuel-powered vehicles and new energy vehicles; (ii) handsets, including

10    component production and assembly; and (iii) rechargeable batteries and photovoltaic

11    technology, including lithium-ion, nickel, lithium ferrous phosphate, and solar battery products.

12    During 2014, the overall revenue of BYD and its subsidiaries was approximately RMB55,366

13    million, or in excess of U.S.$ 8 billion.  *Id.* at 13-16.  BYD and its subsidiaries also maintain a

14    significant presence in the United States, including corporate offices in both Los Angeles and the

15    greater Chicago area and activities in California.  Bussey Decl., Exs. D (BYD Website), E (BYD

16    News Article).  BYD controls a sizeable patent portfolio.  In 2013 alone, it acquired 2,099 patents

17    internationally, ranking fifth for the year among all Chinese companies in issued patents.  As of

18    March 2014, BYD had amassed more than 12,000 Chinese patents.  Bussey Decl., Ex. F (BYD

19    Website).

20    **II.    THE MASTER DEVELOPMENT AND SUPPLY AGREEMENTS**

21    Apple has contracted with BYD and BYD's affiliates to develop, supply, and

22    support components of Apple products in China.  One of the mainstays of this relationship is the

23    2011 MDSA between Apple and BYD, which—until its amendment and restatement in 2014—

24    set forth the terms on which BYD developed, supplied, and supported components for use in

25    Apple products.  Bussey Decl., Exs. A, B (2011, 2014 MDSA).[2]

---

26    [2]    Exhibits A and B to the Bussey Declaration are the same documents as Exhibits 6 and 5
(respectively) to Exhibit A (Request for Arbitration) to Apple's Petition for Order

27    Compelling Arbitration and for Injunctive Relief Pending Arbitration, as referenced in
Apple's Administrative Motion to File Documents Under Seal Pursuant to Civil Local

28    Rules 7-11 and 79-5.

1    In 2014, Apple initiated discussions with BYD executives to update the 2011

2    MDSA with additional terms.  BYD employees and agents were directly and actively involved in

3    these negotiations.  Of critical importance, Apple included a provision prohibiting all BYD

4    entities from bringing, *inter alia*, patent infringement claims against Apple and Apple's suppliers

5    and distributors.  Bussey Decl., Ex. B at 10.

6    **A.    The Non-Assert Agreement**

7    The 2011 and 2014 MDSAs overlap significantly in terms of substance and scope,

8    and contain many identical provisions.  The 2014 MDSA also expressly includes the provision by

9    which BYD Precision, on behalf of itself and all "Related Entities"—which are also bound and

10   include BYD—commits not to assert any claims for infringement of intellectual property rights

11   against Apple or against, among others, Apple's distributors and suppliers.  Bussey Decl., Ex. B

12   at 17.

13   Thus, Section 13.2(e) of the 2014 MDSA (the "Non-Assert Agreement") expressly

14   prohibits *any BYD entity* from asserting any intellectual property claims against Apple or Apple's

15   suppliers and distributors.  Specifically, it provides that:

16
     *[BYD Precision], on behalf of itself, its Related Entities, and*
17   *their successors in interest and permitted assigns, who shall be*
     *bound as [BYD Precision]*, hereby covenants not to assert:  (i) any
18   claims for infringement of any Intellectual Property Rights against
     Apple for any products or services; and (ii) any claims for
19   infringement of any Intellectual Property Rights against Apple's
     direct or indirect customers, partners, consultants, independent
20   contractors, resellers, distributors, or suppliers, but only for
     products (including components) or services made, used, sold,
21   imported, exported, distributed or otherwise provided or disposed
     of by or for Apple.
22

23   Bussey Decl., Ex. B at 10.  The 2014 MDSA defines "Related Entity" to mean the following:

24
     [A]ny other corporation . . . or other business entity that controls, is
25   controlled by, or is under common control with an entity, where
     'control' means that the entity possesses, directly or indirectly, the
26   power to direct or cause the direction of the management policies
     of the other entity, whether through ownership of voting securities,
27   an interest in registered capital, by contract, or otherwise.

28

*Id.* at 17.  Under this definition, as the parent of BYD Precision, BYD is clearly a "Related

Entity."  BYD Precision is indisputably controlled by BYD and is identified in BYD's December

31, 2014 Financial Statements as a connected person and one of BYD's "principal

subsidiaries"—namely, "an entity (including a structured entity), directly or indirectly, controlled

by" BYD such that BYD has "the current ability to direct the [entity's] relevant activities."

Bussey Decl., Ex. C at 50, 88.

### B.   The 2014 MDSA Provides for Disputes Among the Parties to be Resolved by Arbitration

Section 18.1 of the 2014 MDSA provides that the agreement is subject to Apple's

"General Terms and Conditions" set forth in Attachment 2 to that agreement.  Bussey Decl., Ex.

B at 13.  The General Terms and Conditions include a Dispute Resolution, Jurisdiction, and

Venue provision (the "Arbitration Agreement") providing that:

> All disputes arising out of or related to the [2014 MDSA] shall be
> finally settled under the Rules of Arbitration of the International
> Chamber of Commerce (the "ICC Rules") by three arbitrators
> appointed in accordance with such rules, and shall be conducted
> according to the International Bar Association (IBA) Rules on the
> Taking of Evidence in International Arbitration.  The arbitration
> shall take place in San Francisco, California.  The Arbitration shall
> be conducted in English. . . .  Supplier agrees that Apple will be
> irreparably harmed and monetary damages may not be adequate
> compensation if Supplier fails to meet its obligations hereunder . . .
> and that in addition to other remedies, Apple shall be entitled to
> seek injunctive relief or specific performance to prevent any
> threatened or continued breach.

Bussey Decl., Ex. B at 21.

## III.   THE CHINESE PATENT LITIGATION

On April 22, 2015, in direct contravention of the express Non-Assert Agreement in

the 2014 MDSA, BYD filed two virtually identical intellectual property suits in the Shenzhen

Intermediate People's Court against Apple Beijing, four of Apple's direct and indirect Chinese

suppliers, and one of Apple's Chinese distributors.[3]  Pascolini Decl., ¶ 3; *see also* Bussey Decl.,

---

[3]    Although the complaints in these suits were filed on April 22, Apple Beijing was not
served with the complaints in these lawsuits until July 14, 2015.

1   Ex. H (English translations of BYD Chinese complaints).  BYD's action also constituted a breach

2   by BYD Precision of its obligation under Section 18.3 of the 2014 MDSA to guarantee

3   performance of the terms and conditions of the agreement by BYD as a Related Entity.

4          The Chinese Patent Litigation relates to two patents that BYD holds in respect of

5   Super-energy Beam Induced Deposition ("SBID") technology.  The complaints allege that the

6   SBID technology is used in certain iPhone and iPad products,[4] which are manufactured by Apple

7   suppliers and sold by Apple Beijing and an Apple distributor.  Pascolini Decl., ¶ 3.  BYD alleges

8   that an Apple supplier, in collaboration with three other Apple suppliers and the Apple

9   distributor, infringed BYD's patents for the SBID technology, and that Apple sold products

10  containing antennae that infringe BYD's patents.  *Id.*  Specifically, BYD asserts that the

11  technology that an Apple supplier relies on in producing antennae—

12                      —infringes on its own SBID technology.  Pascolini Decl. ¶ 4.

13         The Non-Assert Agreement clearly binds BYD as a "Related Entity" of BYD

14  Precision and prohibits it from bringing the Chinese Patent Litigation.

15         First, the Chinese Patent Litigation is a claim in relation to Intellectual Property

16  Rights as defined by the 2014 MDSA.  Attachment 1 to the 2014 MDSA, "Definitions," defines

17  "Intellectual Property Rights" as:

18          [A]ll current and future rights in . . . patents . . . and any other
            intellectual property rights that may exist anywhere in the world,
19          including, in each case, whether unregistered, registered or
            comprising an application for registration, and all rights and forms
20          of protection of a similar nature or having equivalent or similar
            effect to any of the foregoing.
21

22  Bussey Decl., Ex. B at 16.

23

24         Second, BYD is a "Related Entity" of BYD Precision.  As set forth above, the 2014

25  MDSA defines Related Entity to mean:

26

27  [4]     The complaints allege that the antennae are contained in the "iPad Mini WLAN cell (iPad
            mini3)."  It is unclear whether "iPad Mini WLAN cell (iPad mini3)" intends to refer to the
28          iPad Mini 3 or all iPad products with Wi-Fi capability.  Bussey Decl., Ex. H at 2-3, 5-6.

> [A]ny other corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other business entity that controls, is controlled by, or is under common control with an entity, where 'control' means that the entity possesses, directly or indirectly, the power to direct or cause the direction of the management policies of the other entity, whether through ownership of voting securities, an interest in registered capital, by contract, or otherwise.

*Id.* at 17. As the controlling shareholder of BYD Precision, Bussey Decl., Ex. B at 88, BYD falls squarely within this definition. Accordingly, by bringing and progressing the Chinese Patent Litigation, both BYD and BYD Precision—as guarantor of BYD's compliance with the Non-Assert Agreement—have breached and continue to be in breach of the 2014 MDSA.

In order to preserve its rights under the 2014 MDSA, Petitioner respectfully asks this Court to grant two orders, as follows: first, an order compelling BYD and BYD Precision to arbitrate the parties' dispute in accordance with the Arbitration Agreement, including the issue of whether the Chinese Patent Litigation—and, in particular, any potential liability in relation to that litigation on the part of Petitioner, Petitioner's Beijing affiliate, Petitioner's suppliers, and Petitioner's distributor—is precluded by the Non-Assert Agreement in the 2014 MDSA; and second, an order enjoining BYD from prosecuting the Chinese Patent Litigation pending a final determination of the parties' dispute in the ICC Arbitration.

## ARGUMENT

### I.  THIS COURT SHOULD COMPEL RESPONDENTS TO ARBITRATE THE PARTIES' DISPUTE ARISING UNDER THE 2014 MDSA

Chapter 2 of the Federal Arbitration Act ("FAA"), which codifies the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), governs arbitration agreements between U.S. and foreign corporations. 9 U.S.C. § 202. The statute grants federal district courts original jurisdiction over "action[s] or proceeding[s] falling under the Convention," 9 U.S.C. § 203, as well as authority to compel arbitration "in accordance with the agreement . . . ." 9 U.S.C. § 206.

The FAA establishes a "liberal federal policy favoring arbitration[.]"  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 24 (1983).  Where parties enter into an arbitration agreement, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 218 (1985) (emphasis in original).  The "emphatic federal policy" favoring arbitration "applies with special force in the field of international commerce."  *Balen v. Holland America Line, Inc*., 583 F.3d 647, 652 (9th Cir. 2009) (*quoting Mitsubishi Motors Corp. v. Soler Chrysler– Plymouth*, 473 U.S. 614, 631 (1985)).  Thus, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ."  *Balen*, 583 F.3d at 652.

In determining whether to compel arbitration under the Convention, a district court within the Ninth Circuit must limit its inquiry to whether:  "(1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship . . . which is considered commercial; and (4) a party to the agreement is not an American citizen . . . ."  *Id.* at 654-55 (citation omitted).  If these requirements are satisfied, a court must order arbitration unless it "finds the agreement to be null and void, inoperative, or incapable of being performed."  *Prograph Int'l Inc. v. Barhydt*, 928 F. Supp. 983, 988 (N.D. Cal. 1996) (citation omitted); *see also Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 720 (9th Cir. 1999) ("[T]he district court can determine only whether a written arbitration agreement exists, and if it does, enforce it in accordance with its terms.").

All four predicates are satisfied here.  First, there is an "agreement in writing"—the 2014 MDSA—with an arbitration provision.  Second, the arbitration provision calls for arbitration in San Francisco, which is within the "territory" of the United States, "a signatory of the Convention."  Third, the 2014 MDSA, an agreement for the "Development and Supply" of commercial goods, involves a "commercial" relationship.  *See Belize Soc. Dev. Ltd. v. Gov't of Belize,* 794 F.3d 99, 104 (D.C. Cir. 2015) (holding that use of term "commercial" signals legislative intent to encompass "broadest permissible exercise of Congress' Commerce Clause

1   power"); *see also*, *e.g.*, *Freaner v. Valle*, No. 11CV1819 JLS (MDD), 2011 WL 5596919, at *3

2   (S.D. Cal. Nov. 17, 2011) ("The agreement arises out of a commercial relationship between

3   Plaintiff and Defendants in that the parties agreed for 'design services and products to be sold by

4   Plaintiff to Hotelera.'").  Finally, the 2014 MDSA states that BYD Precision is "organized and

5   existing under the laws of China" and is therefore "not an American citizen."

6        Moreover, the order compelling arbitration binds not only BYD Precision, a

7   signatory to the 2014 MDSA, but also BYD.  The Ninth Circuit has recognized that

8   "nonsignatories of arbitration agreements may be bound by the agreement under ordinary contract

9   and agency principles," *Letizia v. Prudential Bache Secs., Inc.*, 802 F.2d 1185, 1187 (9th Cir.

10  1986), including "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter

11  ego; and 5) estoppel," *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006); *see also*

12  *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 97 (2d

13  Cir. 1999) ("[N]on-signatories to an arbitration agreement may nevertheless be bound according to

14  ordinary principles of contract and agency.").

15       Here, at least two such principles—agency and estoppel—operate to bind BYD to

16  the arbitration provision in the 2014 MDSA.

17       That BYD Precision entered into the 2014 MDSA as an agent of BYD is clear from

18  several facts.  First, the preamble to the 2014 MDSA states that it "amended and restate[d] that

19  certain Master Development and Supply Agreement . . . as of May 19, 2011."  Under the express

20  terms of the 2011 MDSA signed by BYD, BYD Precision could enter into such an amendment

21  *only* as "an authorized signatory" of BYD.  Because BYD Precision was authorized by BYD to

22  enter into the 2014 MDSA, there can be no dispute that BYD is bound under ordinary agency

23  principles.  Additionally, the individuals who negotiated the 2014 MDSA for BYD Precision also

24  work for and hold themselves out as, employees of BYD.  Indeed, in the 2014 MDSA itself, BYD

25  Precision makes representations on behalf of Related Entities, including BYD, and warrants that it

26  has the authority "on behalf of itself and any Related Entity" to enter into the agreement.

27  Accordingly, as BYD Precision entered into the 2014 MDSA as the agent of BYD, BYD is bound

28  to arbitrate under that agreement.  *See Zurich Am. Ins. Co. v. Cebcor Servs. Corp.*, No. 02 C 2283,

1   2003 WL 21418237, at *5 (N.D. Ill. June 18, 2003) (holding that parent was bound to arbitration

2   clause "through principles of agency" where subsidiary entered into agreement as its agent).

3       BYD is also bound by the arbitration agreement in in the 2014 MDSA pursuant to

4   principles of equitable estoppel.  "The linchpin for equitable estoppel is equity—fairness."

5   *Grigson v. Creative Artists Agency LLC*, 210 F.3d 524, 528 (5th Cir. 2000).   In *Wood v. PennTex*

6   *Resources, LP,* for example, one company, PennTex, entered into a Stock Purchase Agreement

7   ("SPA") to purchase a second company, ERG.  458 F. Supp. 2d 355, 371 (S.D. Tex. 2006) *aff'd*

8   *sub nom. Wood v. Penntex Res. LP*, 322 F. App'x 410 (5th Cir. 2009).  The agreement required

9   ERG and its president, Wood, upon receiving indemnity from PennTex, to cede control over a

10   lawsuit that ERG and Wood had brought against a third company.  *Id.* at 358-59.  PennTex

11   provided the indemnity, but Wood refused to dismiss the lawsuit.  *Id.* at 359-60.  PennTex sought

12   to compel Wood, through arbitration under the SPA, to dismiss his claims.  *Id.*  Wood claimed that

13   he was not a party to the SPA, but the court nonetheless compelled him to arbitrate.  The court

14   held that it was "[Wood's] actions as a *plaintiff* pursuing litigation" that violated the SPA and "led

15   to the underlying dispute."  *Id.* at 372.  That is, "[t]he disputed issue" in the arbitration was

16   "whether the Stock Purchase Agreement precludes Wood from pursuing those claims."  *Id.*

17   Moreover, Wood had "participated in negotiating the . . . Stock Purchase Agreement, was named

18   in the Agreement, and ha[d] been involved in its execution and performance."  *Id.* at 370.  Finally,

19   the SPA "imposed obligations on him and provided benefits for him" in the form of indemnities.

20   *Id.*

21       *Wood* controls the outcome of this proceeding.  Here, as in *Wood*, the underlying

22   dispute to be arbitrated is whether, by suing Apple's Related Entities in the Chinese Patent

23   Litigation, the non-signatory—BYD—violated the agreement containing the arbitration

24   agreement.  Here, as in *Wood*, that agreement expressly references the non-signatory—its title is

25   "Amended & Restated Master Development and Supply Agreement Between Apple and **BYD**

26   **Company Limited**"—and was negotiated by the non-signatory.  Further, here, as in *Wood*, the

27   agreement imposes obligations on the non-signatory by preventing it, as a "Related Entity," from

28   pursuing claims against Apple or Apple's affiliates, suppliers, or distributors.  Finally, there can be

1  no doubt here that BYD benefitted directly from the agreement; indeed, until 2014, BYD *was* the

2  signatory to the functionally equivalent contract.

3      BYD is therefore equitably estopped from avoiding arbitrating this dispute under

4  the 2014 MDSA with Apple.  *Wood*, 458 F. Supp. 2d at 372;[5] *see also Legacy Wireless Servs.,*

5  *Inc. v. Human Capital, LLC,* 314 F. Supp. 2d 1045, 1056-58 (D. Or. 2004) (estopping non-

6  signatory from avoiding arbitration because it was closely related to signatory, "played an

7  important role in the consummation of the agreement and in assisting [the signatory in] fulfilling

8  its contractual obligations," and received administrative fees stemming from the deal); *Am. Bureau*

9  *of Shipping v. Tencara Shipyard* S.P.A., 170 F.3d 349, 351-53 (2d Cir. 1999) (compelling non-

10  signatory, owners of yacht, to arbitrate claims against signatory, agency who had erroneously

11  certified to shipbuilder that the vessel was seaworthy, because the certification allowed owners to

12  obtain lower insurance rates and to sail their ship under a French flag).

13  **II.    THIS COURT SHOULD ISSUE AN ANTI-SUIT INJUNCTION PROHIBITING**
14  **BYD FROM PROSECUTING THE CHINESE PATENT LITIGATION PENDING**
   **THE OUTCOME OF THE ICC ARBITRATION**

15      **A.    Legal Standard for an Anti-Suit Injunction**

16      A federal district court having jurisdiction has the power to enjoin parties from

17  proceeding with an action in the courts of a foreign country.  *Seattle Totems, Etc. v. Nat'l Hockey*

18  *League*, 652 F.2d 852, 955 (9th Cir. 1981).  Courts are obliged "to protect their legitimately

19  conferred jurisdiction" in order "to provide full justice to litigants."  *E. &. J. Gallo Winery v.*

20  *Andina Licores S.A.*, 446 F.3d 984, 995 (9th Cir. 2006).  The jurisdiction to issue an anti-suit

21  injunction operates *in personam*, such that the U.S. court enjoins the claimant, not the foreign

22  court.  *Id.* at 989.

23      Injunctive relief is particularly appropriate where, as here, "interim relief is

24  necessary to preserve the status quo and the meaningfulness of the arbitration process."  *See Toyo*

25  *Tire Holdings of Ams., Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 980 (9th Cir. 2010).

26  _____

27  [5]    *Wood* held in the alternative that even though Wood had signed the SPA in his
   representative capacity as president of ERG, he was a party to the agreement due to the
28  individual obligations it imposed on him.  *Id.* at 365.

The Ninth Circuit has established a three-part inquiry for assessing whether to issue an anti-suit injunction.  The court must determine:  (1) whether the parties and issues are the same in the domestic and foreign actions, and whether the domestic action is dispositive of the action to be enjoined; (2) whether any of the factors enunciated by the Fifth Circuit in *In re Unterweser Reederei GMBH* apply;[6] and (3) whether the impact on comity would be tolerable.  *Gallo*, 446 F.3d at 991-93; *Applied Med. Distrib. Corp. v. Surgical Co.*, 587 F.3d 909, 913 (9th Cir. 2009).

**B.**   **The Parties and Issues Are the Same in the U.S. Action and the Chinese Patent Litigation**

The first requirement—that the parties and issues are the same in the domestic and foreign actions—is plainly met here.

**1.**   **The Parties to the ICC Arbitration and the Chinese Patent Litigation Are the Same**

In determining whether the parties to the foreign and domestic actions are the same, "perfect identity of the parties is not required."  *Zynga, Inc. v. Vostu, USA, Inc.*, 816 F. Supp. 2d 824, 828 (N.D. Cal. 2011) (citing *Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*, 441 F. Supp. 2d 552, 562 (S.D.N.Y. 2006)).  For an anti-suit injunction to issue, "it suffices that the parties be affiliated in such a way that their interests coincide."  *Id.*

The table below summarizes the overlap among the parties in the pending actions.

|  | ICC Arbitration | U.S. Proceeding | Chinese Patent Litigation |
|---|---|---|---|
| **Apple, Inc. ("Apple")** | Petitioner | Petitioner | -- |
| **Apple Electronic Products Commerce (Beijing) Co., Ltd., Yitian Shenzhen Branch ("Apple Beijing")** | -- | -- | Respondent |
| **BYD Company Limited ("BYD")** | Respondent | Respondent | Petitioner |
| **BYD Precision Manufacturing Co., Ltd. ("BYD Precision")** | Respondent | Respondent | -- |

---

[6]   As described more fully below, the relevant factors are whether the foreign litigation would:  (1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's *in rem* or *quasi in rem* jurisdiction; or (4) prejudice other equitable considerations.  428 F.2d 888, 896 (5th Cir. 1970).

As the table reflects, there is total overlap among the parties to the ICC arbitration and this proceeding, on the one hand, and the Chinese Patent Litigation, on the other, except that (1) Apple Inc. is not a party to the Chinese Patent Litigation, (2) Apple Beijing is not a party to the ICC arbitration, and (3) the ICC arbitration additionally includes BYD Precision, a subsidiary of BYD.  As a practical matter, because the Non-Assert Agreement is binding on BYD and BYD Precision as Related Entities, and confers a benefit on Apple and all of its Related Entities, including Apple Beijing, as well as all of Apple's "suppliers" and "distributors," including those named as defendants in the Chinese Patent Litigation, these differences have no effect on whether the ICC arbitration and this proceeding would dispose of the Chinese Patent Litigation.  Further, the interests of Apple Inc. and Apple Beijing perfectly coincide.  As the parent of Apple Beijing, Apple will be required to oversee and participate in the Chinese Patent Litigation to the same extent as Apple Beijing.  Indeed, Apple and Apple Beijing share an equal interest in ensuring that there is no disruption to the Apple business or supply chain.

In such a situation, the parties are sufficiently "the same" for this court to issue an anti-suit injunction.  *See Zynga*, 816 F. Supp. 2d at 828-29.

### 2.   The Same Issue Underlies the ICC Arbitration and U.S. Proceeding and the Chinese Patent Litigation

The next inquiry is whether the issues are the same in the foreign and domestic actions.  As the Ninth Circuit has repeatedly emphasized, the inquiry at this step does not require that the issues in both actions be *identical*.  *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 882-83 (9th Cir. 2012).  Instead, the court asks whether the issues functionally overlap such that the issues in the foreign action can be resolved in the local action.  *Id.*  To the extent that the domestic action will dispose of the issues in the foreign action, "the issues are meaningfully 'the same.'"  *Id.* at 882 (quoting *Applied*, 587 F.3d 909).

Where, as here, the contractual issues raised in the ICC Arbitration would foreclose the patent claims brought in the Chinese Patent Litigation, the issues are deemed to be the same.  *Microsoft*, 696 F.3d at 882-84.  The Ninth Circuit addressed precisely this situation in *Microsoft*.  In that case, Motorola successfully petitioned a German court for an injunction

barring Microsoft from infringing Motorola's German-issued patents.  Microsoft then brought an anti-suit injunction against Motorola in the Northern District of California to prevent Motorola from enforcing the German injunction, on grounds that Motorola had implicitly contracted not to enjoin users of its patented technology.  Motorola argued that an anti-suit injunction was not appropriate because the U.S. action could not resolve the German action, given that the German patents were issued under German law and had no extraterritorial effect.  The district court concluded the issues presented in the domestic and German litigations were the same, and the Ninth Circuit affirmed.  The court reasoned that an anti-suit injunction was appropriate:

> [W]here the precise issue before the U.S. court was not the patents themselves, but 'a contract between the parties' not to enforce the patents . . . .  In other words, the party was 'not seeking to enjoin [a party from litigating in] a foreign court on the basis of a patent validity or infringement finding by a United States court' but on the basis of a contract interpretation by a U.S. court.

*Id.* at 883 (citing *Medtronic, Inc. v. Catalyst Research Corp.*, 518 F. Supp. 946, 955 (D. Minn. 1981) (internal citations omitted)).

This case falls squarely within *Microsoft*'s ambit:  Apple seeks to enjoin the Chinese Patent Litigation because that litigation violates BYD's obligation under the Non-Assert Agreement to abstain from bringing patent infringement proceedings against Apple and its "Related Entities," including Apple Beijing and Apple's suppliers and distributors.

Importantly, this Court does not need to decide that Apple *will* ultimately succeed on its contract claims; instead, the Court needs only to determine after a "ballpark, tentative assessment of the merits" that the contract claims *could* dispose of the Chinese Patent Litigation. *Microsoft*, 696 F.3d at 884-85.  That requirement is plainly met here.  Resolution of the contractual issue, which Apple seeks to address through the ICC Arbitration—that the Non-Assert Agreement bars BYD entirely from bringing the Chinese Patent Litigation—would unquestionably dispose of the Chinese Patent litigation.

1

2

**C.      The Chinese Patent Litigation Frustrates This Court's Policies Favoring Forum Selection Provisions, Including Arbitration Agreements**

3

4

5

6

7

8

9

The second step in the anti-suit injunction analysis is to determine whether any of the *Unterweser* factors apply.  Those factors are whether the foreign litigation would:  (1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's *in rem* or *quasi in rem* jurisdiction; or (4) prejudice other equitable considerations. *Microsoft*, 696 F.3d at 882 (citing *Unterweser*, 428 F.2d at 896).  These factors are disjunctive so that the presence of any factor may justify an anti-suit injunction.  *Microsoft*, 696 F.3d, at 881; *Gallo*, 446 F.3d at 990.  Here, the *Unterweser* factors counsel in favor of an anti-suit injunction.

10

11

12

13

14

15

16

First and foremost, the Chinese Patent Litigation would frustrate this forum's strong policy in favor forum selection clauses.  The Ninth Circuit explained the importance of forum selection clauses in *Gallo*:  "Forum selection clauses are increasingly used in international business.  When included in freely negotiated commercial contracts, they enhance certainty, allow parties to choose the regulation of their contract, and enable transaction costs to be reflected accurately in the transaction price."  *Gallo*, 446 F.3d at 992 (citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593-94 (1991).

17

18

19

20

21

22

23

As the Ninth Circuit has repeatedly recognized, "without the availability of anti-suit injunctions, the vitality of forum selection clauses would be impermissibly and improvidently jeopardized."  *Applied*, 587 F.3d at 919.  Here, the parties expressly contracted that all disputes arising out of or related to the 2014 MDSA shall be settled via arbitration under the ICC Arbitration Rules in San Francisco, California.  An anti-suit injunction is an appropriate remedy to ensure that the parties' chosen forum—an arbitral tribunal—can adjudicate whether the 2014 MDSA precludes the Chinese Patent Litigation.

24

**D.      This Contract Dispute Between Private Parties Has No Effect on Comity**

25

26

27

28

The final inquiry that the Court must undertake is whether the "impact on comity is tolerable."  *Microsoft*, 696 F.3d at 886 (citing *Gallo*, 446 F.3d at 991).  This comity analysis will counsel against an anti-suit injunction only if the court concludes that the "interference [with comity] is so great as to be intolerable."  *Id.*

2

3

Courts have consistently held that a private contract dispute between two parties has no effect on comity whatsoever, much less an effect so intolerable as to prevent the court from enjoining vexatious foreign litigation.  *See, e.g.*, *Microsoft*, 696 F.3d at 887 ("[C]omity is less likely to be threatened in the context of a private contractual dispute than in a dispute implicating public international law or government litigants.").  Further, an anti-suit injunction that serves to enforce a contract between private parties does not violate standards of comity even where one party may "have enjoyed different procedural or substantive advantages under another country's law."  *Microsoft*, 696 F.3d at 888 (citing *Gallo*, 446 F.3d at 994).  To the contrary, "where there is no public international issue raised, a foreign government is not involved in the litigation, and the litigation involves private parties concerning disputes arising out of a contract, not only would an anti-suit injunction not have an intolerable impact on comity, but allowing foreign suits to proceed in such circumstances would seriously *harm* international comity."  *InterDigital Tech. Corp. v. Pegatron Corp.*, No. 15-02584, 2015 WL 3958257, at *8 (N.D. Cal. June 28, 2015) (quoting *Applied*, 587 F.3d at 921) (citations omitted).

This is precisely the situation now before the Court.  This dispute is between entirely private parties.  No foreign government is involved.  The parties have expressly agreed to be bound by U.S. law.[7]  The issues presented do not implicate any public or international issues.  Under these circumstances, the issuance of an anti-suit injunction would have no negative impact on comity whatsoever.

**E.**   **Apple Will Be Irreparably Harmed if Forced to Defend the Chinese Patent Litigation**

The harm to Apple if BYD is not restrained from pursuing the Chinese Patent Litigation is clear:  in the absence of injunctive relief, Apple will be forced to bear the burden and expense of defending itself in litigation in China, while facing a potentially significant disruption in its supply chain, lost sales, and unquantifiable damages to its reputation and goodwill with

---

[7]   The 2014 MDSA contains a choice of law provision in the General Terms and Conditions, set forth in Attachment 2 to that agreement, which provides that "the rights and obligations of the Parties shall be governed by and construed and enforced under the laws of the State of Delaware, without regard to choice of law principles."  Bussey Decl., Ex. B at 21.

consumers and businesses that demand Apple products.

The likely harm to Apple is made even more egregious because Apple, following arms' length negotiations, received contractual assurances that BYD entities would never bring the very claims that BYD now asserts.  Moreover, it is clear that parties understood the harm that would be inflicted on Apple in the exact circumstances at hand, because the 2014 MDSA expressly recognizes the potential for such harm.  Specifically, the Arbitration Agreement in the 2014 MDSA provides that:

> Supplier agrees that Apple will be irreparably harmed and monetary damages may not be adequate compensation if Supplier fails to meet its obligations hereunder . . . and that, in addition to other remedies, Apple shall be entitled to seek injunctive relief or specific performance to prevent any threatened or continued breach.  The parties hereby waive any requirements for security for obtaining any provisional relief.

In short, the parties unambiguously stipulated that any contractual breach would result in irreparable harm to Apple, such that the injunctive relief Apple now seeks is appropriately granted.

1    By contrast, an anti-suit injunction will result in *no harm* to BYD or BYD

2   Precision.  The requested relief would merely enforce, pending a final determination of the parties'

3   dispute in the arbitration, the contractual terms to which those parties stipulated.  Moreover, the

4   relief that Apple seeks is limited in scope.  Apple seeks an anti-suit injunction for only as long as

5   necessary for an arbitral tribunal to resolve Apple's contract claims.  Should the arbitral tribunal

6   resolve these claims in BYD's favor, BYD is free to continue pursuing the Chinese Patent

7   Litigation.

8    Under these circumstances, an anti-suit injunction is appropriate.

9                                                     **<u>CONCLUSION</u>**

10   For all the foregoing reasons, Apple respectfully requests that the Court compel

11   Respondents to arbitrate the parties' dispute over the Non-Assert Agreement arising under the

12   2014 MDSA and, pending the outcome of the arbitration, enjoin Respondents from prosecuting

13   the Chinese Patent Litigation.

14   Dated:  October 29, 2015                 SIMPSON THACHER & BARTLETT LLP

15

16                                            By:  /s/ Harrison J. Frahn IV
                                                   Harrison J. Frahn IV
17                                                 hfrahn@stblaw.com
                                                   Jason Bussey
18                                                 jbussey@stblaw.com
                                                   2475 Hanover Street
19                                                 Palo Alto, California 94304
                                                   Telephone: (650) 251-5000
20                                                 Facsimile:  (650) 251-5002

21                                                 Peter Thomas(*pro hac vice* application
                                                   forthcoming)
22                                                 pthomas@stblaw.com
                                                   Janet Whittaker(*pro hac vice* application
23                                                 forthcoming)
                                                   janet.whittaker@stblaw.com
24                                                 900 G Street, N.W.
                                                   Washington, D.C.  20001
25                                                 Telephone: (202) 636-5500
                                                   Facsimile:  (202) 636-5502

26                                                 *Attorneys for Petitioner Apple Inc.*

27

28

2

3