ALLEN RUBY (SBN 47109)
Allen.Ruby@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1400
Palo Alto, California 94301
Telephone:     (650) 470-4500
Facsimile:     (650) 470-4570

LANCE A. ETCHEVERRY (SBN 199916)
Lance.Etcheverry@skadden.com
ABRAHAM A. TABAIE (SBN 260727)
Abraham.Tabaie@skadden.com
ALLISON B. HOLCOMBE (SBN 268198)
Allison.Holcombe@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:     (213) 687-5000
Facsimile:     (213) 687-5600

Attorneys for Respondents
BYD PRECISION MANUFACTURING CO., LTD.
and BYD COMPANY LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| APPLE INC., | CASE NO.: 3:15-cv-04985-RS |
| Petitioner, | RESPONDENTS' OPPOSITION TO APPLE INC.'S MOTION TO COMPEL ARBITRATION AND FOR PRELIMINARY INJUNCTION |
| v. | |
| BYD PRECISION MANUFACTURING CO., LTD. and BYD COMPANY LIMITED, | Hearing Date: January 14, 2016 |
| Respondents. | Time:          1:30 p.m. |
| | Courtroom:   3 |
| | Judge:         Hon. Richard Seeborg |

REDACTED VERSION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................... 1

I.      STATEMENT OF FACTS .................................................................... 2

      A.    Limited's And Precision's Separate Agreements With Apple .................. 3

      B.    Apple Dramatically Overstates The Breadth Of The 2014 MDSA ........... 5

      C.    Apple's Patent Infringement And The Present Controversy .................... 5

ARGUMENT ................................................................................................................... 6

II.    APPLE'S MOTION TO COMPEL ARBITRATION MUST BE DENIED
      AS TO BOTH LIMITED AND PRECISION. ....................................... 6

      A.    As A Non-Signatory To The 2014 MDSA, Limited Cannot Be
          Compelled To Arbitrate. ...................................................................... 6

      B.    Limited Cannot Be Compelled To Arbitrate Under An Agency Or
          Estoppel Theory..................................................................................... 9

      C.    Respondents Cannot Be Compelled To Arbitrate Because Claims
          Related To The Chinese Patent Litigation Do Not Arise Under The
          2014 MDSA. ......................................................................................14

      D.    The Court Should Not Issue An Order Compelling Precision To
          Arbitrate Because Precision Never Refused To Arbitrate In The First
          Instance. .............................................................................................16

III.   APPLE HAS FAILED TO SATISFY ITS BURDEN OF SATISFYING
      THE REQUIREMENTS FOR AN ANTI-SUIT INJUNCTION.........................17

      A.    The Parties And Issues In The Chinese Litigation Are Not The Same
          As In The Arbitration...........................................................................17

      B.    The Chinese Patent Litigation Does Not Frustrate This Forum's
          Policy Favoring Arbitration Provisions, Because Limited Is Not
          Subject To That Provision......................................................................19

      C.    An Anti-Suit Injunction Against Limited Would Have An Intolerable
          Effect On International Comity. .............................................................21

      D.    Apple Has Not Proven Irreparable Harm And The Balance of
          Equities Tips Sharply In Limited's Favor................................................22

CONCLUSION................................................................................................................25

## TABLE OF AUTHORITIES

**CASES**                                                                                          **PAGE(S)**

*American Bureau of Shipping v. Tencara Shipyard S.P.A.*,
    170 F.3d 349 (2d Cir. 1999) ................................................................................ 14

*Apple, Inc. v. Psystar Corp.*,
    673 F. Supp. 2d 943 (N.D. Cal. 2009) ................................................................... 1

*Applied Medical Distribution Corp. v. Surgical Co. BV*,
    587 F.3d 909 (9th Cir. 2009) ................................................................. 19, 20, 21

*Bridas S.A.P.I.C. v. Government of Turkmenistan*,
    345 F.3d 347 (5th Cir. 2003) ............................................................................ 7, 11

*Cantor Fitzgerald, L.P. v. Prebon Securities (USA) Inc.*,
    731 A.2d 823 (Del. Ch. 1999) ............................................................................... 9

*Citadel Broadcasting Corp. v. Dolan*,
    No. 09 Civ. 6914 (SAS), 2009 WL 4928935 (S.D.N.Y. Dec. 21, 2009) ............................ 15

*Comedy Club, Inc. v. Improv West Associates*,
    553 F.3d 1277 (9th Cir. 2009) .......................................................................... 7, 20

*Comer v. Micor, Inc.*,
    436 F.3d 1098 (9th Cir. 2006) .......................................................................... 7, 13

*Converse, Inc. v. American Telecommunications, Inc.*,
    No. 06 Civ. 6825(PKL), 2006 WL 3016315 (S.D.N.Y. Oct. 23, 2006) ................. 22, 23, 24

*Contratto v. Ethicon, Inc.*,
    227 F.R.D. 304 (N.D. Cal. 2005) ........................................................................ 10

*Doe v. Unocal Corp.*,
    248 F.3d 915 (9th Cir. 2001) ................................................................................. 9

*eBay, Inc. v. Bidder's Edge, Inc.*,
    100 F. Supp. 2d 1058 (N.D. Cal. 2000) ............................................................... 25

*E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*,
    269 F.3d 187 (3d Cir. 2001) ........................................................................ 7, 9, 10

*Empresa Grenadora de Electricidad ITABO v. Corporacion Dominicana de Empresas
    Electricas Estatales*,
    No. 05 CIV 5004 RMB, 2005 WL 1705080 (S.D.N.Y. July 18, 2005) ................... 22, 23

*Energy Capital Co. v. Caribbean Trading & Fidelity Corp.*,
    No. 93 Civ.8100, 1996 WL 157498 (S.D.N.Y. April 4, 1996) ............................ 22, 23, 24

*In re Excel Innovations, Inc.*,
    502 F.3d 1086 (9th Cir. 2007) ............................................................................ 22

*Flintkote Co. v. Aviva PLC*,
    769 F.3d 215 (3d Cir. 2014) ......................................................................... 12, 13

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) (en banc) .......................................................... 23

*Hughes v. United States*,
  953 F.2d 531 (9th Cir. 1992) ........................................................................... 24

*Hybritech Inc. v. Abbott Laboratories*,
  849 F.2d 1446 (Fed. Cir. 1988) ....................................................................... 25

*Invista S.a.r.l. v. Rhodia S.A.*,
  Civil No. 08–941 (RBK/JS), 2009 WL 1439407 (D. Del. May 20, 2009) .................... 2, 13

*Knutson v. Sirius XM Radio, Inc.*,
  771 F.3d 559 (9th Cir. 2014) ...................................................................... 14, 15

*Kramer v. Toyota Motor Corp.*,
  705 F.3d 1122 (9th Cir. 2013) ......................................................................... 20

*Kuroda v. SPJS Holdings, LLC, C.A.*,
  No. 4030-CC, 2010 WL 4880659 (Del. Ch. Nov. 30, 2010) ................................... 9

*Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*,
  67 F.3d 20 (2d Cir. 1995) ................................................................................. 15

*Ledee v. Ceramiche Ragno*,
  684 F.2d 184 (1st Cir. 1982) ............................................................................ 14

*Legacy Wireless Services, Inc. v. Human Capital, L.L.C.*,
  314 F. Supp. 2d 1045 (D. Or. 2004) ................................................................. 14

*Lifescan, Inc. v. Premier Diabetic Services, Inc.*,
  363 F.3d 1010 (9th Cir. 2004) ......................................................................... 16

*Lopez v. Kmart Corp.*,
  No. 15–cv–01089–JSC, 2015 WL 2062606 (N.D. Cal. May 4, 2015) ...................... 16

*Microsoft Corp. v. Lindows.Com, Inc.*,
  319 F. Supp. 2d 1219 (W.D. Wash. 2004) ......................................................... 17

*Microsoft Corp. v. Motorola, Inc.*,
  696 F.3d 872 (9th Cir. 2012) ...................................................................... 18, 19

*Mundi v. Union Security Life Insurance Co.*,
  55 F.3d 1042 (9th Cir. 2009) ........................................................................... 13

*Murphy v. DirecTV, Inc.*,
  724 F.3d 1218 (9th Cir. 2013) ....................................................................... 7, 9

*NAMA Holdings, LLC v. Related World Market Center, LLC*,
  922 A.2d 417 (Del. Ch. 2007) ..................................................................... 12, 13

*Nike, Inc. v. Cardarelli*,
  No. 3:14-CV-01690-BR, 2015 WL 853008 (D. Or. Feb. 26, 2015) ............... 18, 20, 21

*Open Text, S.A. v. Box, Inc.*,
  36 F. Supp. 3d 885 (N.D. Cal. 2014) ................................................................ 22

*Opticians Association of America v. Independent Opticians of America*,
    920 F.2d 187 (3d Cir. 1990)............................................................................25

*Pace v. Honolulu Disposal Service*,
    227 F.3d 1150 (9th Cir. 2000)............................................................................8

*Playboy Enterprises, Inc. v. Netscape Communications Corp.*,
    55 F. Supp. 2d 1070 (C.D. Cal. 1999), *aff'd*,
    202 F.3d 278 (9th Cir. 1999)............................................................................23

*Progressive International Corp. v. E.I. Du Pont de Nemours & Co.*,
    No. C.A. 19209, 2002 WL 1558382 (Del. Ch. July 9, 2002) ...............................8

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) ..........................................................................10

*Rexnord, Inc. v. Laitram Corp.*,
    628 F. Supp. 467 (E.D. Wis. 1986) ...................................................................24

*Ryan v. Microsoft Corp.*,
    No. 14–CV–04634–LHK, 2015 WL 1738352 (N.D. Cal. Apr. 10, 2015) ..........19

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*,
    608 F. Supp. 2d 1166 (N.D. Cal. 2009) ...............................................................9

*Sussex Financial Enterprises, Inc. v. Bayerische Hypo-Und Vereinsbank AG*,
    460 F. App'x 709 (9th Cir. 2011) ........................................................................8

*Teller v. Dogge*,
    No. 2:12-CV-591 JCM GWF, 2012 WL 4792912 (D. Nev. Oct. 9, 2012).........20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. M 07–1827 SI, 2013 WL 3784938 (N.D. Cal. July 18, 2013) .....................15

*Thomson-CSF, S.A. v. American Arbitration Association*,
    64 F.3d 773 (2d Cir. 1995)..................................................................................7

*United Brotherhood of Carpenters & Joiners of America,
    Local No. 1780 v. Desert Palace, Inc.*,
    94 F.3d 1308 (9th Cir. 1996)............................................................................16

*United States v. Apple, Inc.*,
    992 F. Supp. 2d 263 (S.D.N.Y. 2014), *aff'd*,
    787 F.3d 131 (2d Cir. 2015)................................................................................1

*Whiteside v. Teltech Corp.*,
    940 F.2d 99 (4th Cir. 1991)...............................................................................16

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) .......................................................................................17, 22

*Wood v. PennTex Resources, L.P.*,
    458 F. Supp. 2d 355 (S.D. Tex. 2006) ...............................................................14

*Zurich American Insurance Co. v. Cebcor Service Corp.*,
    No. 02 C 2283, 2003 WL 21418237 (N.D. Ill. June 18, 2003)..........................................11

*Zynga, Inc. v. Vostu USA, Inc.*,
    816 F. Supp. 2d 824 (N.D. Cal. 2011) .......................................................17, 19

**Statutes and Rules**

9 U.S.C. § 4.............................................................................................................................2, 16

Civil Local Rule 7-3(d)(1) .......................................................................................................10


**Other Authorities**

11A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948.1
    (3d ed. 1998)...........................................................................................................22

## INTRODUCTION

True to its reputation as a heavy-handed litigant with a penchant for taking extreme positions,[1] Apple has turned to this Court and an International Chamber of Commerce ("ICC") arbitration panel to ask that a run-of-the-mill development and supply agreement with BYD Precision Manufacturing Company Limited ("Precision"), a partially-owned and distant subsidiary of BYD Company Limited ("Limited"), be transformed into an agreement that grants Apple and every one of Apple's vendors, suppliers and affiliates a free license to infringe on the entirety of Limited's expansive intellectual property portfolio.  In support of this unprecedented position, Apple asks this Court to overlook the following critical facts:

- Limited is **not** a party or signatory to the 2014 Master Development and Supply Agreement (Dkt. 3-3, Declaration of Jason M. Bussey ("Bussey Decl.") Ex. B "2014 MDSA"), the agreement in question;

- ███████████████████████████████████████████████████████

- As a partially-owned subsidiary – many steps away from Limited in the corporate structure – Precision had no authority to bind Limited in the fashion that Apple alleges.

With these facts in mind, and the law that tips sharply in favor of Limited and Precision on these issues, Apple's request that this Court enjoin Limited's rights to enforce its intellectual property rights in China and compel Limited to arbitrate (under a provision it never signed) must be denied.

As a first step in its efforts to secure unfettered rights to Limited's intellectual property portfolio, Apple has sought to compel Limited and Precision to arbitration before an ICC tribunal in San Francisco.  Apple's motion must as a matter of law be denied as to both BYD entities.  As noted, Limited was not party to the 2014 MDSA, and, therefore, cannot be bound by its arbitration clause – which was between Apple and Precision exclusively.  Apple has put forth no evidence that Precision signed the 2014 MDSA as Limited's agent or that Precision had any authority to subject

---

[1] *See United States v. Apple, Inc.*, 992 F. Supp. 2d 263, 268 (S.D.N.Y. 2014) (admonishing the "blatant and aggressive disregard at Apple for the requirements of the law") (citation omitted), *aff'd*, 787 F.3d 131 (2d Cir. 2015); *Apple, Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 952-53 (N.D. Cal. 2009) (condemning Apple for its discovery gamesmanship and finding that "[t]he high-handed unilateral self-help by Apple certainly smacked of trying to 'have it both ways,' and offended the undersigned's sense of fair play").

1 │ Limited to arbitration under the agreement. ███████████████████████████

2 │ ████████████████████████████████████████████████████████████████

3 │ ████████████████████ (*See* Declaration of Linna Shang in Support of Opposition ("Shang

4 │ Decl.") ¶¶ 4-5.)  As such, Precision agreed to arbitrate on its own behalf, not on behalf of Limited

5 │ or any other entity.  Because Precision stands prepared to arbitrate Apple's claim, there is no basis

6 │ for an order compelling it to arbitration.  *See* 9 U.S.C. § 4 (providing an ability to compel

7 │ arbitration once a party is "aggrieved by the alleged failure, neglect, or refusal of another to

8 │ arbitrate . . . ").

9 │     Apple's equitable estoppel argument – *i.e.*, that Limited has "directly benefited" from the

10 │ 2014 MDSA and, therefore, should be bound by its terms – similarly falls flat.  Apple has pointed

11 │ to no benefit that Limited received as a result of the 2014 MDSA, aside from indirect financial

12 │ benefit by virtue of its partial and distant ownership of Precision.  Such an indirect benefit is *per se*

13 │ insufficient under the law.  *See Invista S.a.r.l. v. Rhodia S.A.*, 2009 WL 1439407, at *4 (D. Del.

14 │ May 20, 2009).  Put simply, had Apple intended to bind Limited to the terms of the 2014 MDSA's

15 │ arbitration provision, it unquestionably would have included such language in the agreement itself.

16 │     Apple's request for an anti-suit injunction precluding Limited from litigating its patent

17 │ claims in China must likewise be denied.  As an initial matter, the Chinese patent litigation that is

18 │ the subject of the motion has already been discontinued – thereby mooting Apple's motion.  In any

19 │ event, even if the motion were ripe for consideration, Apple cannot satisfy any of the stringent

20 │ requirements for the issuance of an anti-suit injunction:  (i) there is little or no overlap between the

21 │ parties and issues in the arbitration and the Chinese patent litigation; (ii) Apple actively litigated

22 │ the Chinese patent litigation for months without ever raising the arbitration argument it now

23 │ contends is dispositive; (iii) Apple has failed to demonstrate any irreparable harm that would result

24 │ from denial of its motion; and (iv) the balance of hardships tips decidedly in favor of Limited,

25 │ which would be foreclosed from taking action to protect its entire intellectual property portfolio.

26 │ **I.**   **STATEMENT OF FACTS**

27 │     Limited is a leading innovator in the design and manufacture of sustainable energy

28 │ technology and high-end consumer electronic products such as smart phones, tablets, and notebook

---

2

1    computers.  (Dkt. 3-04, Bussey Decl. Ex. C at 3.)  In recent years, Limited's cutting-edge research

2    has made it one of China's largest patent holders and a leader in rechargeable battery

3    manufacturing and new energy vehicle technology.  (Dkt. 3-07, *id.* Ex. F, at 1.)  Several of

4    Limited's partially-owned subsidiaries, including Precision, also design, manufacture, and

5    assemble consumer electronic products for worldwide technology brands, including Samsung,

6    Nokia, HTC, and Apple.  (Dkt. 3-04, *id.* Ex. C, at 2.)  ***However***, ***Precision is many steps removed***

7    ***from Limited in the corporate organizational chart.***  (Declaration of Li Qian in Support of

8    Opposition ("Qian Opp'n Decl.") ¶ 3.)

9         **A.**    **Limited's And Precision's Separate Agreements With Apple**

10            **1.**    <u>2011 MDSA Between Apple And Limited</u>

11        In 2011, Limited and Apple entered into a Master Development and Supply Agreement,

12   whereby Limited agreed to develop and supply components for Apple's line of consumer

13   electronic products.  (Mot. 3.)

14

15

16

17

18                             Limited and Apple adhered to the 2011 MDSA without incident.

19            **2.**    <u>2014 MDSA Between Precision And Apple</u>

20        In 2014, Apple demanded that the parties negotiate a new Master Development and Supply

21   Agreement.  (*See* 2014 MDSA.)  During the course of negotiating the 2014 MDSA, Ms. Lisa Shao

22   and Ms. Linna Shang, employees of BYD America, Corp., emailed Apple executives with several

23   changes to the draft contract.  (Shang Decl. Ex. A.)

24

25

26

27

28                         (*Id.* (emphasis

3

1  added).)  Apple ████████████████████ executed the 2014 MDSA with Precision

2  exclusively as reflected in the signature block below:



3

4

5

6

7

8  (2014 MDSA at 14.)  Notably, while Apple claims to have signed the 2014 MDSA in March of

9  2015, it was not sent to Precision – or any BYD entity – until *October 2015, after* Limited had

10  commenced litigation against Apple.  (*See* Qian Opp'n Decl. ¶ 9.)

11       By contrast, no representative of Limited negotiated or signed the agreement.  (Qian Opp'n

12  Decl. ¶ 4.)  Nor did the individuals who negotiated the agreement on Precision's behalf – Mr. Sun

13  Yi-zao, Ms. Shao, or Ms. Shang – ever represent to Apple that they were acting on behalf of

14  Limited in negotiating or executing the agreement.  (Declaration of Sun Yi-zao in Support of

15  Opposition ("Yi-zao Decl."); Shang Decl. ¶ 4.)

16       The 2014 MDSA was not a mere modification of the 2011 MDSA, as Apple would have

17  this Court believe; it was a completely new agreement.  The 2014 MDSA explicitly stated that it

18  "amended and *restates* that certain Master Development and Supply Agreement . . . as of May 19,

19  2011." (2014 MDSA at 1 (emphasis added).) ████████████████████████████

20  ████████████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ████████

23       The final 2014 MDSA between Precision and Apple was also different from the 2011

24  MDSA between Limited and Apple in many other respects, including:

25       Different Parties.  As described above, the parties to the 2011 MDSA were Apple and

26  Limited.  Apple and Limited were the only signatories to the agreement.  (2011 MDSA at 23.)  The

27  2014 MDSA specifically ████████████████████████████████ (2014

28  MDSA at 17.)  Representatives from Apple and Precision are the *only* signatories to the agreement.

4

1    <u>Different Purposes</u>.  The purpose of the 2011 MDSA was to state ████████████
2    ███████████████████████████████████████████████████████████████████████
3    ████████████████████████████████████████████████████████████████████████
4    █████████████████████████████████████████████████████
5    ██████████████████

6    <u>Non-Assert Provision</u>.  The 2014 MDSA between Apple and Precision contained a "Non-
7    Assert" provision that Apple argues should be read to override Limited's rights to bring intellectual
8    property claims against Apple or any of its vendors, suppliers or affiliates.  (2014 MDSA
9    § 13.2(e).)  ████████████████████████████████████████████████

10   <u>Arbitration Agreement</u>.  The 2014 MDSA requires Apple and Precision to resolve "[a]ll
11   disputes arising out of or related to the Agreement . . . under the Rules of Arbitration of the [ICC]."
12   (2014 MDSA, Attach. 2, at 21.)  ████████████████████████████████████
13   ███████████████████████████████████████████

14   **B.    <u>Apple Dramatically Overstates The Breadth Of The 2014 MDSA</u>**

15   According to Apple, the non-assert provision of the 2014 MDSA gives Apple and every
16   one of its affiliates, vendors and suppliers license to infringe the entirety of BYD's IP portfolio
17   with impunity.  Putting aside that the law does not permit parties to read contractual language in a
18   vacuum – and the agreement when read as a whole clearly limits the scope of any non-infringement
19   obligations to the ██████████████████████████████████████████████████████
20   ████████ Apple's argument makes no commercial sense.  BYD's IP portfolio encompasses
21   more than 18,000 patents and 1,600 registered copyrights and trademarks.  (Qian Opp'n Decl. ¶ 5.)
22   The suggestion that, even if Precision had the authority to bind Limited, Precision would have
23   signed over the rights to Limited's massive IP portfolio to Apple and its suppliers, vendors and
24   affiliates worldwide strains credulity.

25   **C.    <u>Apple's Patent Infringement And The Present Controversy</u>**

26   In late 2014, Limited discovered that various Apple subsidiaries and third-party suppliers
27   were infringing two of Limited's patents by using Limited's award-winning technology called
28   Super-energy Beam Induced Deposition ("SBID") in Apple iPhone and iPad products without

5

Limited's consent.  (*Id.* ¶ 6.)  SBID is a technology that allows Limited to produce powerful

antennae small enough to fit inside handheld devices like a cell phone.  (*Id.* ¶ 7.)  *Neither Limited*

*nor Precision ever provided SBID-treated components to Apple under either the 2011 or 2014*

*MDSAs*.  (*Id.* ¶ 8 (emphasis added).)  Therefore, on April 22, 2015, Limited brought two patent

infringement suits in the Shenzhen Intermediate People's Court (the "Chinese Patent Litigation")

against a Chinese Apple subsidiary, four Apple suppliers, and an Apple distributor.

Apple vigorously litigated the Chinese Patent Litigation for months, both in the Shenzhen

Intermediate People's Court and even on appeal before the High Court of Guangdong Province

*without even once mentioning the 2014 MDSA as a basis for why the litigation should be*

*discontinued*.  (*See* Declaration of Lance A. Etcheverry in Support of Opposition ("Etcheverry

Decl.") Exs. A-1 – A-2.)  Instead, Apple argued that the Chinese court lacked jurisdiction over the

infringement claims on the grounds that:  (a) on the merits, Limited had not proven the goods

themselves were infringing or that Apple was a joint infringer with its suppliers and distributors;

and (b) Shenzen is not the place of the alleged infringement.  (*See id.*)  The High Court issued its

verdict on November 4, 2015, affirming the Intermediate People's Court's ruling that jurisdiction

was proper.  (*Id.* Exs. B-1 – B-2.)

Shortly before the High Court rendered its verdict, Apple filed a Petition to Compel

Arbitration in this Court.  On November 11, 2015, to facilitate settlement communications between

Apple and Precision, Limited voluntarily discontinued the Chinese Patent Litigation.  (*See id.*, Exs.

C-1 – C-2.)  As Precision has repeatedly stated to Apple, however, Limited will not, under any

circumstances, submit to Apple's attempt to improperly force a nonsignatory into arbitration or to

trample, without conviction, on its extensive intellectual property rights.

## ARGUMENT

**II.** **APPLE'S MOTION TO COMPEL ARBITRATION MUST BE DENIED AS TO BOTH LIMITED AND PRECISION.**

**A.** **As A Non-Signatory To The 2014 MDSA, Limited Cannot Be Compelled To Arbitrate.**

Apple wants this Court to rubber stamp its request to compel arbitration because of the

"liberal federal policy" favoring arbitration.  (Mot. 8 (citation omitted).)  However, the "strong

1  public policy in favor of arbitration does not extend to those who are not parties to an arbitration

2  agreement." *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1287 (9th Cir. 2009)

3  (citation omitted); *Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006) ("The question

4  here is not whether a particular issue is arbitrable, but whether a particular *party* is bound by the

5  arbitration agreement.  Under these circumstances, the liberal federal policy regarding the scope of

6  arbitrable issues is inapposite."); *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin*

7  *Intermediates, S.A.S.*, 269 F.3d 187, 194 (3d Cir. 2001) ("[T]here is no dispute that a non-signatory

8  cannot be bound to arbitrate unless it is 'bound under traditional principles of contract and agency

9  law' to be akin to a signatory of the underlying agreement.") (citation omitted).

10         Accordingly, courts in the Ninth Circuit routinely reject attempts to compel parties to

11 arbitrate when those parties did not sign an arbitration agreement.  *See, e.g., Comer*, 436 F.3d at

12 1103-04 ("Because . . . [the] petition comes within the general rule that a nonsignatory is not bound

13 by an arbitration clause, [nonsignatory] Comer is not required to arbitrate his . . . claim."); *Murphy*

14 *v. DirecTV, Inc.*, 724 F.3d 1218, 1234 (9th Cir. 2013) (rejecting motion to compel arbitration

15 where "Plaintiffs . . . did not agree to arbitrate their claims . . . ."); *see also, e.g., Bridas S.A.P.I.C.*

16 *v. Government of Turkmenistan*, 345 F.3d 347, 355 (5th Cir. 2003) (holding that a foreign

17 government was not bound by an arbitration agreement where the government did not sign the

18 agreement, was not defined as a party, and was hardly mentioned elsewhere in the agreement);

19 *DuPont*, 269 F.3d at 202 (holding that parent was not bound by its subsidiary's arbitration

20 agreement where the parent had not signed the agreement); *Thomson-CSF, S.A. v. Am. Arbitration*

21 *Ass'n*, 64 F.3d 773, 776-80 (2d Cir. 1995) (holding that a nonsignatory parent was not bound by its

22 subsidiary's arbitration agreement even though the agreement purported to bind the parent).

23         In *Bridas*, for example, the court refused to enforce an arbitration agreement against the

24 Government of Turkmenistan because:  (1) the government had not signed the agreement; (2) the

25 government was not defined as a party to the agreement; and (3) the government was not

26 prominently mentioned in the agreement.  345 F.3d at 355.  Thus, the agreement did not "signal an

27 intention to bind the Government to its terms, and thus to arbitrate" the dispute.  *Id.*

28         The same indicia of lack of intent to arbitrate in *Bridas* are present here.  Indeed, there is no

1  dispute that Limited did not sign the 2014 MDSA.  (*See* Mot. 9.)  ███████████████████

2  ████████████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████████

4  ███████[2]   Thus, by the plain language of the 2014 MDSA, there was no intention by the parties to bind

5  Limited to its terms.

6         Apple's attempt to invoke extrinsic evidence (in the form of unspecified oral statements by

7  Precision representatives) to bind Limited to the arbitration clause is similarly without merit.  (Pet.

8  ¶¶ 31-32.)  ████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  █████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████  (*See id.*)

24         As there was no agreement to arbitrate between Apple and Limited, the Court must, as a

25  ────────────────────────

[2]        In fact, Limited is mentioned ***only a single time*** in the entire 2014 MDSA; the heading on

26  the first page reads: "Amended & Restated[] Master Development and Supply Agreement[]
Between Apple and BYD Company Limited."  (*See* 2014 MDSA at 1 (fonts and spatial

27  arrangement altered).)  The 2014 MDSA makes clear, however, that the agreement "is entered into
by and between Apple Inc. . . . and ***BYD Precision Manufacturing Co. Ltd.***" (*id.* (emphasis

28  added)),  ████████████████████████████████████████████████████████

---

8

matter of law, deny Apple's attempt to compel Limited to arbitration.

**B.      Limited Cannot Be Compelled To Arbitrate Under An Agency Or Estoppel Theory.**

Apple tacitly concedes that the plain language of the 2014 MDSA does not require Limited to arbitrate this dispute.  (Mot. 9.)  For this reason, Apple attempts to invoke two narrow exceptions – agency and equitable estoppel – where courts have allowed in very limited circumstances nonsignatories to be bound by arbitration agreements.  (Mot. 9-11.)  Apple has failed to demonstrate the applicability of either narrow exception in this case.

1.      Limited Is Not Bound By The Arbitration Provision Under An Agency Theory.

Apple seeks to rely on the exception that "nonsignatories of arbitration agreements may be bound by the agreement under . . . agency principles."  (Mot. 9 (citation omitted).)  To bind a nonsignatory to an arbitration agreement "the plaintiff must demonstrate that the agent was acting on behalf of the principal and that the cause of action arises out of that relationship." *DuPont*, 269 F.3d at 198.[3]  A principal-agent relationship exists when "one person (a principal) manifests assent to another person (an agent) that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to so act." *Kuroda v. SPJS Holdings, LLC*, 2010 WL 4880659, at *5 (Del. Ch. Nov. 30, 2010) (denying plaintiff's attempt to bind a nonsignatory through an agency theory); *Cantor Fitzgerald, L.P. v. Prebon Secs. (USA) Inc.*, 731 A.2d 823, 830 (Del. Ch. 1999) (holding that a parent company was not bound by an arbitration clause agreed to by its subsidiary through common law agency principles).  In assessing whether a subsidiary is the agent of its parent, the parent's "ownership position alone . . . is not enough to establish a principal-agent relationship and bind [the parent] to [the subsidiary's] arbitration agreement." *Cantor Fitzgerald*, 731 A.2d at 830.[4]

---

[3]      When determining whether a nonsignatory is bound by an arbitration agreement under an agency theory, courts look to state contract law. *Murphy*, 724 F.3d at 1232 n.8.  As demonstrated in this section, Delaware law (the law chosen by the 2014 MDSA (to the extent even applicable to Limited as a nonsignatory)) and California law are identical on this issue.

[4]      *See also Doe v. Unocal Corp.*, 248 F.3d 915, 930 (9th Cir. 2001) ("[T]he fact that [the parent] indirectly owns or holds the stock of [its subsidiaries] does not, without more, convert [the subsidiaries] into general agents."); *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1189 (N.D. Cal. 2009) ("[T]he degree of control exercised by the parent in order

*(cont'd)*

1    In *DuPont*, for example, a subsidiary of DuPont was party to a joint venture agreement that

2  contained an arbitration clause.  *DuPont*, 269 F.3d at 198.  One of the other parties to the joint

3  venture agreement sought to compel arbitration against DuPont under the theory that the subsidiary

4  had acted as DuPont's agent and bound DuPont to the agreement.  *Id.*  The court rejected this

5  theory even though DuPont owned the subsidiary and was closely involved in the joint venture.  *Id.*

6  at 198-99.  In upholding the district court's decision to deny arbitration, the Third Circuit relied on

7  the movant's complete failure to demonstrate that the signatory was acting on behalf of DuPont in

8  entering the joint venture:  "appellants have failed to cite either the relevant factors we should

9  consider in determining whether [signatory] DCH acted as [nonsignatory] DuPont's agent or any

10 case that would carry the day."  *Id.* at 198.

11    Like the appellants in *DuPont*, Apple wants this Court to find an agency relationship

12 without explaining what is required to establish such a relationship or offering ***any*** relevant

13 evidence or case law in support of its theory.  *See DuPont*, 269 F.3d at 198.  Also, as in *DuPont*,

14 there is ***no*** evidence that Precision was even purporting to act on Limited's behalf, much less

15 evidence that Limited actually gave Precision (a partially-owned subsidiary, many steps removed)

16 the authority to do so.  In fact, the only evidence of the parties' intent when entering the 2014

17 MDSA affirmatively demonstrates that neither side understood Precision to be acting as Limited's

18 agent. ██████████████████████████████████████████████

19 ████████████████████████[5]

20    Casting even greater doubt on Apple's agency theory, courts have long been skeptical of

21 agency arguments by sophisticated, well-represented parties, where the agency principles are not

22 specifically embodied in a written agreement:

23  _____
    *(cont'd from previous page)*
24 for the subsidiary to qualify as an agent must therefore exceed . . . the normal scope of any such
    relationship.").

25  [5]    Having failed to submit any evidence to support its agency theory with its opening papers,
    Apple should be foreclosed from doing so on reply.  *See* Civil Local Rule 7-3(d)(1) ("If new
26 evidence has been submitted in the reply, the opposing party may file . . . an Objection to Reply
    Evidence . . . ."); *see also, e.g., Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (new
27 evidence may not be submitted on reply with no opportunity to respond); *Contratto v. Ethicon,
    Inc.*, 227 F.R.D. 304, 309 (N.D. Cal. 2005) ("[A]ttempt to introduce new evidence in . . . reply . . .
28 is improper.").

1        We are simply unable to conclude that the parties, one a multi-national corporation who has negotiated joint venture agreements in the past, and the other, a sovereign nation, both represented by able counsel, intended [signatory] to sign the [agreement] as an agent of the [nonsignatory] in the absence of clearer language to that effect.

4 *Bridas*, 345 F.3d at 358. Apple is the epitome of a sophisticated company. Had Apple intended to

5 bind Limited (as a nonsignatory) to the arbitration provision in the 2014 MDSA, it would have

6 insisted on having that agreement expressed in writing.

7        In place of contract language or case law, Apple makes three unsuccessful arguments to

8 establish agency.[6] First, Apple claims – without citation – that Precision must be Limited's agent

9 because the 2014 MDSA "amended and restate[d]" the 2011 MDSA which, by its terms, could

10 only be modified or amended by an "authorized signatory" of BYD. (Mot. 9 (alteration in the

11 original).) However, as Apple's argument makes clear, the 2014 MDSA does not purport to be a

12 "modification" as contemplated by the 2011 MDSA. The 2014 MDSA states that it "amended and

13 *restates*" the earlier agreement and everything about the document demonstrates that it is a new,

14 separate agreement. (*See* Sec. I.A., *supra*.) Most tellingly, the 2014 MDSA is between *different*

15 *parties*, neither of which is Limited.

16       Second, Apple makes the unsupported assertion that "the individuals who negotiated the

17 2014 MDSA for BYD Precision also work for and hold themselves out as, employees of

18 [Limited]." (Mot. at 9.) The only individuals demonstrably involved in negotiating the 2014

19 MDSA are Ms. Shao, who actually signed the agreement for Precision, and Ms. Shang who was

20 involved in the negotiations. (*See* Shang Decl. ¶¶ 1, 3-5.) Neither Ms. Shao nor Ms. Shang work

21 for Limited. (*See* Pet. ¶¶ 31-32.) Apple admits that Ms. Shao works for another entity, BYD

22 America. (*Id.* ¶ 32 ("Lisa Shao . . . is the General Manager for Business Development at BYD

23 America.").) Ms. Shang also works for BYD America, not Limited. (Shang Decl. ¶ 1, Ex. A.)

24 Ms. Shao and Ms. Shang *never* represented to Apple that they were acting on behalf of Limited or

25 ──────────────
[6]     Apple ignores well-settled agency law and cites only a single case (which it does not

26 explain) in support of its far-fetched theory. In *Zurich Am. Ins. Co. v. Cebcor Serv. Corp.*, the court found that a company, Cebic, was acting as the agent of another company, Cebco, because Cebic's

27 only purpose was to carry out the trust Cebcor was obligated to fund. 2003 WL 21418237, at *5 (N.D. Ill. June 18, 2003). Based on that agency relationship, Cebic was bound by the arbitration

28 clause signed by Cebcor. *Id.* That case is not relevant here, where there is no evidence that Precision was authorized to act, or did act, as Limited's agent in regards to the 2014 MDSA.

11

1  had authority to bind Limited to the 2014 MDSA.  (Shang Decl. ¶ 4.)  To the contrary, Ms. Shao

2  and Ms. Shang made absolutely clear to Apple ███████████████████████████████████████

3  █████████████████████████████████████████████████████████████████████

4      Mr. Yi-zao, the General Manager of Precision, is the only employee Apple actually alleges

5  was employed by Limited.  (*See* Pet. ¶¶ 31-32; Yi-zao Decl. ¶ 1.)  However, Mr. Yi-zao's

6  employment is irrelevant to Apple's agency argument because he did not sign the 2014 MDSA,

7  and he was not even involved in the negotiations, other than attending a single, early meeting.  (Yi-

8  zao Decl. ¶¶ 1, 3-4.)  In recognition of his limited role, Apple stops short of claiming that Mr. Yi-

9  zao actually bound Limited to the 2014 MDSA.  (*See* Pet. ¶¶ 31, 34.)

10     Finally, Apple's motion selectively quotes the 2014 MDSA to state that "Precision . . .

11  warrants that it has the authority 'on behalf of itself and any Related Entity' to enter into the

12  agreement."  (Mot. 9.)  This argument is disingenuous.  What the 2014 MDSA actually states is

13  that "[Precision] represents and warrants on behalf of itself and any Related Entity of Company

14  that:  (i) [Precision] has the right to enter into this Agreement . . . ."  (2014 MDSA § 14.1.)  In

15  other words, Precision had the authority to enter into the agreement that it executed.  Nowhere does

16  this representation and warranty indicate that Precision intended to bind Limited to the terms of the

17  arbitration provision.

18           2.    Apple's Equitable Estoppel Theory Fails Because Limited Did Not Seek To
                   Benefit From The 2014 MDSA.

19

20     To invoke equitable estoppel, the party asserting estoppel bears "the burden of producing

21  clear and convincing proof" that the nonsignatory should be bound to arbitrate.  *Flintkote Co. v.*

22  *Aviva PLC*, 769 F.3d 215, 221 (3d Cir. 2014) (reversing an order compelling a nonsignatory to

23  arbitrate under an equitable estoppel theory).  Courts should "proceed with a good deal of caution"

24  when considering whether to invoke estoppel against a nonsignatory "lest nuanced concepts of

25  equity be allowed to override established legal principles of contract formation."  *NAMA Holdings,*

26  *LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 433 n.35 (Del. Ch. 2007).  Apple fails even to

27  approach the burden for invoking equitable estoppel in this case.

28

1       Estoppel is available only where a nonsignatory embraces some portions of a contract but

2   disclaims others by "direct[ly], rather than indirect[ly], benefit[ing] from the [agreement] during

3   the course of the agreement's performance." *Flintkote*, 769 F.3d at 221 (alterations in the

4   original).[7]  Receiving an indirect benefit under the contract, such as through an ownership interest

5   in the signatory, is ***not*** sufficient grounds to invoke equitable estoppel.  *Invista*, 2009 WL 1439407,

6   at *4 (holding that the nonsignatory's ownership of the signatory did not give it a direct interest in

7   the agreement such that equitable estoppel was proper); *NAMA Holdings, LLC*, 922 A.2d at 432-33

8   (holding that a nonsignatory company had not accrued the direct benefit from a contract necessary

9   for equitable estoppel where the company was part of a group that owned one of the signatories).

10       Apple's only support for its equitable estoppel theory is the bald assertion, without further

11   elaboration, that "[Limited] benefited directly from the agreement . . . [because] until 2014,

12   [Limited] *was* the signatory to the functionally equivalent contract." (Mot. 11 (emphasis in the

13   original).)  Notably, Apple does not name a single direct benefit Limited received from the 2014

14   MDSA.

15       Apple's argument cannot be saved by its assertion that the 2011 MDSA and the 2014

16   MDSA are "functionally equivalent." (Mot. 11.)  On their face, the 2011 and 2014 MDSAs are

17   materially different in numerous respects, including:

18   •   The 2011 MDSA specifies that the agreement is ███████████████████████

19   ████████████████████████;

20   • ██████████████████████████████████████████████████

21   ██████████████████████████████████████████████████

22   ████████████████████████████████████

23   • ██████████████████████████████████████████████████

24   ██████████████████████████████████████████████

25



---

7    The analysis and result would be the same under California law on equitable estoppel.

*Comer*, 436 F.3d at 1101 (to invoke equitable estoppel, the movant must demonstrate that the

nonsignatory "knowingly exploit[ed] the agreement containing the arbitration clause despite having

never signed the agreement"); *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1047 (9th Cir.

2009) (affirming the denial of a motion to compel arbitration under an equitable estoppel theory).

1   In light of these material differences, Apple's assertion that the two agreements are "functionally

2   equivalent" fails to demonstrate any direct benefit that flowed to Limited from the new agreement.

3        Without any support for its position under Delaware or California law, Apple declares that

4   a lone Southern District of Texas case applying Texas law "controls" here.  (Mot. 10.)  Even if it

5   were controlling authority, which it plainly is not, *Wood v. PennTex Resources, L.P.* does not

6   compel a different result.  Putting aside the court's primary holding in the case that Mr. Wood

7   actually signed the agreement at issue and was found to have manifested an intent to be bound in

8   his individual capacity – facts that are plainly not present here, as to Limited – there was a "direct

9   benefit" that Mr. Wood (as an agent of the parties to the agreement) received:  he personally

10  received indemnification, a full release of claims, and almost $80,000 in attorney's fees.  458 F.

11  Supp. 2d 355, 371 (S.D. Tex. 2006).  The court found that Mr. Wood could not embrace these

12  benefits under the contact and then reject the requirement to arbitrate.  *Id.*[8]  That holding has no

13  application here, where Limited is not a signatory to the 2014 MDSA and received no "direct

14  benefit" from the agreement.

15       **C.    Respondents Cannot Be Compelled To Arbitrate Because Claims Related To
             The Chinese Patent Litigation Do Not Arise Under The 2014 MDSA.**

16
         After determining that a nonsignatory could be bound by an agreement to arbitrate, which is
17
    not the case here, a district court should then consider whether "there [is] an agreement in writing
18
    to arbitrate the subject of the dispute."  *Ledee v. Ceramiche Ragno*, 684 F.2d 184, 186 (1st Cir.
19
    1982).  Apple, "as the party seeking to compel arbitration, has the burden of proving the existence
20
    of an agreement to arbitrate by a preponderance of the evidence."  *Knutson v. Sirius XM Radio,*
21
    *Inc.*, 771 F.3d 559, 565 (9th Cir. 2014).  In assessing whether the parties have agreed to arbitrate
22
    the subject of the dispute, courts examine the scope of the arbitration agreement, and determine
23

24  _____
    [8]    Apple's additional case law is equally unavailing as each case involves a nonsignatory who
25  received a direct benefit from the contract containing the disputed arbitration agreement.  *See*
    *Legacy Wireless Servs., Inc. v. Human Capital, L.L.C.*, 314 F. Supp. 2d 1045, 1056 (D. Or. 2004)
26  (denying motion to dismiss where nonsignatory allegedly received 50% of administrative fees
    received under disputed contract); *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d
27  349, 353 (2d Cir. 1999) (denying motion to dismiss where nonsignatory allegedly received
    significantly lower insurance rates and the ability to sail under the French flag as a result of the
28  disputed contract).

1  whether the claims at issue are encompassed within that agreement.  *See, e.g.*, *In re TFT-LCD (Flat*

2  *Panel) Antitrust Litig.*, 2013 WL 3784938, at *3 (N.D. Cal. July 18, 2013) (rejecting arbitration

3  when the antitrust claims at issue were not encompassed by the arbitration agreement); *see also*

4  *Knutson*, 771 F.3d at 564-65 ("Under the FAA, the basic role for courts is to determine (1) whether

5  a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the

6  dispute at issue.") (citation omitted).  If the claims at issue fall outside the scope of the arbitration

7  agreement, courts will not compel arbitration.  *See, e.g.*, *Leadertex, Inc. v. Morganton Dyeing &*

8  *Finishing Corp.*, 67 F.3d 20, 28 (2d Cir. 1995) (affirming denial of motion to compel arbitration

9  where the plaintiff's tort claims were broader than the contract's subject matter); *Citadel Broad.*

10  *Corp. v. Dolan*, 2009 WL 4928935, at *5-6 (S.D.N.Y. Dec. 21, 2009) (same).

11    Here, Limited's patent infringement claims against Apple have nothing to do with the 2014

12  MDSA.  The 2014 MDSA between Apple and Precision is narrow in scope – it merely

13  

14  

15    On the other hand, in the Chinese Patent Litigation, Limited alleges that Apple

16  misappropriated ***Limited's*** intellectual property in certain antenna designs that are in no way

17  related to the goods and related services that are provided to Apple under the 2014 MDSA.  (*See*

18  Sec. I.C., *supra*.)

19    Apple's attempt to invoke the Non-Assert Provision against Limited, a parent many steps

20  removed, cannot be taken seriously.  It belies all logic and reasoning to believe that Limited, with

21  over 18,000 patents (Qian Opp'n Decl. ¶ 5) in such disparate areas as electric vehicles, ion

22  batteries, and innumerable other technologies would simply allow Apple ***or any of Apple's***

23  ***suppliers*** to trample on each and every one of its intellectual property rights at will.  Taking

24  Apple's argument to its logical conclusion, Apple is arguing that it (or even one of its suppliers)

25  could start making "BYD" electric vehicles, misappropriating BYD copyrighted promotional

26  materials, or even start calling itself BYD, and Limited would lack any legal recourse.

27    Ultimately, were the Court to find that Limited is somehow bound by the arbitration clause,

28  then the question of whether the Chinese Patent Litigation is within the scope of the agreement is

15

RESPONDENTS' OPPOSITION TO MOTION TO COMPEL ARBITRATION AND FOR PRELIMINARY INJUNCTION  CASE NO. 3:15-cv-04985-RS

one that goes to the ultimate merits of the issue that will need to be arbitrated (*i.e.*, can the Non-assert provision be read to encompass patent claims with respect to products that are not the subject of the 2014 MDSA).  Thus, that is a question that the arbitration panel should consider and resolve with a more developed record.  *See United Bhd. of Carpenters & Joiners of Am., Local No. 1780 v. Desert Palace, Inc.*, 94 F.3d 1308, 1310 (9th Cir. 1996) (holding that "the district court was correct in requiring the arbitrator . . . to decide the question of arbitrability" where the parties agreed to "a broad arbitration clause"); *Lopez v. Kmart Corp.*, 2015 WL 2062606, at *3 (N.D. Cal. May 4, 2015) ("Although the court may initially determine whether a valid agreement exists, disputes over the meaning of specific terms are matters for the arbitrator to decide.").

> **D.      The Court Should Not Issue An Order Compelling Precision To Arbitrate Because Precision Never Refused To Arbitrate In The First Instance.**

The plain language of Section 4 of the Federal Arbitration Act makes clear that a district court only has the power to compel arbitration when one party has failed, neglected, or refused to arbitrate.  9 U.S.C. § 4 ("A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition . . . for an order directing that such arbitration proceed in the manner provided for in such agreement."); *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991) ("To state a claim to compel arbitration under the FAA, the plaintiff must allege . . . (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.").  Accordingly, if a party against whom the order is sought has actually agreed to arbitrate, the court may not enter an order compelling arbitration against that party.  *See Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1013 (9th Cir. 2004) ("Under the terms of the FAA, there was no 'failure, neglect, or refusal' by Premier to arbitrate in this case; . . . There was therefore no basis for an order . . . compelling arbitration.").

Here, to put it bluntly, Apple jumped the gun in seeking an order compelling arbitration against Precision.  Precision has never refused to arbitrate with Apple – nor could it have, because Apple never asked Precision before initiating the present action.  Precision will submit to arbitration of Apple's claims against it before the ICC.  Therefore, there is no basis for the Court to enter an order compelling Precision to arbitrate.  *See id.*

**III.     APPLE HAS FAILED TO SATISFY ITS BURDEN OF SATISFYING THE
REQUIREMENTS FOR AN ANTI-SUIT INJUNCTION.**

A courts' power to enjoin parties from proceeding with foreign litigation should be "used

sparingly."[9]  *Microsoft Corp. v. Lindows.Com, Inc.*, 319 F. Supp. 2d 1219, 1221 (W.D. Wash.

2004) ("It is with grave reluctance that this Court approaches the request to inject itself into the

proceedings of the court of another sovereign nation.").  Where preliminary injunctive relief

"would prevent a party from litigating similar claims in a foreign court," a court must first

determine (a) whether the parties and the issues are the same in the foreign and the domestic

proceeding, and (b) whether the domestic action disposes of the foreign action to be enjoined.

*Zynga, Inc. v. Vostu USA, Inc.*, 816 F. Supp. 2d 824, 827 (N.D. Cal. 2011).  If the court finds that

these threshold requirements have been satisfied, it must then consider whether:  (i) the foreign

litigation would frustrate a policy of the forum issuing the injunction; and (ii) whether the impact

on comity would be tolerable.  *Id.*

As a form of preliminary injunctive relief, a court evaluating a motion for an anti-suit

injunction must assess whether the party seeking relief can demonstrate (1) that it is likely to

succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary

relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public

interest.  *Id.* (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).[10]  Apple has

satisfied none of these threshold factors.

**A.     The Parties And Issues In The Chinese Litigation Are Not The Same As In The
Arbitration.**

**1.     There Is No Overlap Between The Parties, Other Than Limited, Which Is An
Improper Party In This Action.**

Apple argues there is a "total overlap among the parties" to this action and the Chinese

---

[9]     This Court should not issue an anti-suit injunction here for one simple reason: there is no
longer any action to enjoin as Limited has withdrawn the Chinese Patent Litigation.  (Etcheverry
Decl. Exs. C-1 – C-2.)  This should end the inquiry as the reasons for an anti-suit injunction are
now moot.

[10]     Courts have noted that Ninth Circuit law is unclear as to whether the anti-suit injunction
factors replace the normal four *Winter* factors, "or whether they replace only the requirement that
the movant show a likelihood of success on the merits of the underlying claim."  *See, e.g.*, *Zynga*,
816 F. Supp. 2d at 828 n.4.  However, district courts have continued to assess irreparable harm,
balance of the equities, and the public interest.  *Id.*

1  Patent Litigation (Mot. 12-13), but as Limited cannot and should not be a party to this action or the

2  arbitration in the first place, ***there is actually no overlap between the parties whatsoever***.  (*See*

3  Sec. II, *supra*.)  A true representative chart of the proper parties to this action is set forth below:



10

11  Aside from Limited, ***none*** of the parties to the Chinese Patent Litigation are parties to this case or

12  the pending ICC arbitration.

13          2.      The Issues Underlying The U.S. And Chinese Actions Are Not The Same
                        And The ICC Arbitration Would Not Be Dispositive.
14

15          Even if the parties were the same, under "the first prong of the anti-suit injunction analysis,

16  a plaintiff must establish [that] the first action is dispositive of the action to be enjoined."  *Nike,*

17  *Inc. v. Cardarelli*, 2015 WL 853008, at *5 (D. Or. Feb. 26, 2015).

18          Apple argues that this Court need not decide whether Apple will succeed on its claim and

19  should merely focus on whether its contract claim "*could*" dispose of the Chinese Patent Litigation

20  based on a "ballpark, tentative assessment of the merits[.]"  (Mot. 14 (*quoting Microsoft Corp. v.*

21  *Motorola, Inc.*, 696 F.3d 872, 884-85 (9th Cir. 2012)).)  *Microsoft* sets no such standard.

22          Although the court in *Microsoft* did state that "[o]rdinarily, we do not assess at all the

23  likelihood of success on the merits in [anti-suit injunction requests]," it went on to hold that in

24  certain cases, "a ballpark, tentative assessment of the merits of the contract dispute is intrinsically

25  bound up with the threshold anti-suit injunction inquiry."  696 F.3d at 883-84.  The court noted

26  that, there, "Motorola [did] not dispute that its RAND commitments created a contract that

27  Microsoft [could] enforce as a third-party beneficiary . . . ."  *Id.* at 884.  Crucially, the court then

28  held that "[i]f we concluded that the district court's interpretation of the RAND commitment as a

1   contract enforceable by Microsoft was fundamentally legally erroneous, then we would have to

2   conclude that it was an abuse of discretion for the district court to rule that the U.S. contract action

3   might dispose of the German patent action." *Id.*; *see also Applied Med. Distribution Corp. v.*

4   *Surgical Co. BV*, 587 F.3d 909, 915 (9th Cir. 2009) (recognizing that a threshold inquiry is whether

5   "all the issues in the foreign action fall under the forum selection clause").  Put differently, the

6   court recognized that if a petitioner puts forward a theory of how it can enforce a contract against a

7   respondent that is "fundamentally legally erroneous" – say, because the respondent is not a party to

8   the contract – as a matter of law, the petitioner cannot obtain an anti-suit injunction because its

9   erroneous contract theory could never validly dispose of a foreign action.

10      Accordingly, this Court cannot, as Apple suggests, simply make a ballpark assessment of

11  whether the arbitration ***could*** dispose of the Chinese Patent Litigation; it must actually assess the

12  merits of Limited's arguments.[11]  As Apple's theory that Limited is bound by the 2014 MDSA is

13  fundamentally legally erroneous, it would be an abuse of discretion for the Court to issue an anti-

14  suit injunction.  (*See* Sec. II, *supra*; *Microsoft*, 696 F.3d at 884.)  Accordingly, once the Court

15  concludes that Limited is not, in fact, bound by the 2014 MDSA, it must deny Apple's request for

16  an anti-suit injunction.

17      **B.    The Chinese Patent Litigation Does Not Frustrate This Forum's Policy
           Favoring Arbitration Provisions, Because Limited Is Not Subject To That**
18         **Provision.**

19      Even if Apple could establish the threshold requirements for an anti-suit injunction, it

20  would still have to prove that allowing the Chinese Patent Litigation to continue would frustrate

21  United States policy.  *See Zynga*, 816 F. Supp. 2d at 830.  Apple has not made this showing.

22      Apple argues that denying an anti-suit injunction in this case would frustrate the federal

23  policy favoring enforcement of forum selection clauses.  (Mot. 15.)[12]  In assessing whether

24  allowing foreign litigation to continue would subvert a forum selection clause, courts do not

25

26  [11]    Although perhaps self-evident, it bears noting that because Precision has not filed any
    infringement claims against Apple, there are no overlapping "suit" parties or issues to enjoin, and
27  therefore an anti-suit injunction against Precision would likewise be inappropriate.

28  [12]    Because "an agreement to arbitrate is actually a specialized forum selection clause," "the
    analysis of one is therefore applicable to the analysis of the other."  *Ryan v. Microsoft Corp.*, 2015
    WL 1738352, at *6 n.3 (N.D. Cal. Apr. 10, 2015) (citation omitted).

19

1  passively accept that the clause is applicable and binds the parties.  *See Nike*, 2015 WL 853008, at

2  *6 (holding that the federal policy in favor of enforcing forum selection clauses was not offended

3  where some of the foreign claims stemmed from contracts without such clauses).  Rather, courts

4  assess whether the forum selection clause at issue is even applicable to the parties and issues in the

5  foreign suit, and if the clause is inapplicable as to some parties or claims, the federal policy

6  favoring enforcement of forum selection clauses is not offended by allowing the foreign litigation

7  to continue.  *See id.*; *see also Comedy Club*, 553 F.3d at 1287 (9th Cir. 2009) ("The strong public

8  policy in favor of arbitration does not extend to those who are not parties to an arbitration

9  agreement."); *accord Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1127 (9th Cir. 2013) (same).

10  In *Nike*, for example, the former employee defendant brought claims in an Italian court

11  related to, *inter alia*, stock options he received from 2006 to 2013.  2015 WL 853008, at *6.  Some

12  options did not contain a forum selection clause, while others did.  *Id.*  After the Italian litigation

13  commenced, Nike sought an anti-suit injunction in federal court.  *Id.*  The court held that allowing

14  the Italian litigation to continue would not offend the Ninth Circuit's policy favoring enforcement

15  of forum selection clauses because the Italian litigation involved claims stemming from the option

16  agreements, to which no forum selection clause applied.  *Id.*  In reaching this result, the court

17  distinguished the case Apple relies on – *Applied Medical Distribution Corp. v. Surgical Co. BV*,

18  587 F.3d 909 (9th Cir. 2009) – on the grounds that *Applied Medical* did not "involve litigation of

19  issues related to contracts that did not contain any forum-selection clauses."  *Id.*

20  The same is true here.  As Limited has now exhaustively explained, it was not a party to the

21  2014 MDSA, and so is not subject to that agreement's arbitration clause.  Thus, denying Apple an

22  anti-suit injunction would not offend the United States' policy favoring enforcement of valid forum

23  selection clauses, because there is no applicable forum selection clause to enforce.  *See id.*; *see also*

24  *Teller v. Dogge*, 2012 WL 4792912, at *4 (D. Nev. Oct. 9, 2012) ("The crucial forum policy of

25  upholding forum selection clauses does not apply in this case.  Obviously, there was never any

26  business agreement between plaintiff and defendant so they could not have contracted to litigate in

27  a particular forum in the event of a dispute.").

28

20

1       **C.**    **An Anti-Suit Injunction Against Limited Would Have An Intolerable Effect On International Comity.**

2

3       Under the third prong of the Ninth Circuit's anti-suit injunction standard, such injunctions

4 are inappropriate unless the impact of issuing the injunction "'on comity would be tolerable.'"

5 *Nike*, 2015 WL 853008, at *6 (quoting *Applied Med.*, 587 F.3d at 919). Enjoining foreign

6 litigation has an intolerable effect on comity when the parties have not agreed to litigate their

7 dispute in a different forum, and when the foreign litigation has already significantly progressed.

8 *See id.* The impact on international comity in this case would be intolerable.

9       In *Nike*, the Court held that "comity [was] implicated" by the plaintiff's request for an anti-

10 suit injunction because certain aspects of the foreign litigation at issue in that case were not subject

11 to "any forum selection clause." *Id.* at *7. The Court then held that the impact on comity of

12 enjoining the foreign litigation would have been intolerable because: (1) the foreign action did

13 "not involve parties who agreed to litigate all elements of their dispute in" the district court; (2) the

14 party seeking the anti-suit injunction had already substantially participated in the foreign action by

15 engaging foreign counsel, filing pleadings, presenting testimony and evidence, engaging experts,

16 and participating in numerous hearings; and (3) the party seeking the injunction had "waited for

17 several months before pursuing an anti-suit injunction in" the district court. *Id.* at *8.

18       Here, Apple is attempting to enjoin Limited even though it is not a party to the 2014 MDSA

19 arbitration clause, and Limited did not agree to arbitrate its disputes with Apple. Furthermore,

20 Apple has been actively defending itself in the Chinese Patent Litigation for months; like the

21 plaintiff in *Nike*, it has filed pleadings, made motions, and even taken appeals. (Etcheverry Decl.

22 Exs. A-1 – B-2.) Apple has also been aware of the Chinese Patent Litigation since July 2015 at the

23 latest, but, as in *Nike*, waited months before pursuing an anti-suit injunction in this Courte or ***even***

24 ***providing Precision with a signed copy of the 2014 MDSA***. (*See* Mot. 2; Qian Opp'n Decl. ¶ 9.)

25       In many respects, Apple's conduct here is even more egregious than the plaintiff's conduct

26 in *Nike*. Apple waited to file this action until after both the Shenzhen Intermediate People's Court

27 and the High Court (an appellate court) rejected Apple's argument that its subsidiaries and

28 suppliers were not subject to those courts' jurisdiction. (Etcheverry Decl. Exs. A-1 – B-2.) In all

21

1   of those proceedings, Apple *never once* mentioned the Non-Assert provision in the 2014 MDSA,

2   seriously undermining its claim that the Non-Assert provision applies to Limited and waiving its

3   right to seek an injunction here.  Apple's conduct thus makes clear that this action is little more

4   than a thinly veiled attempt at forum shopping.

5       **D.**    **Apple Has Not Proven Irreparable Harm And The Balance of Equities Tips**

6           **Sharply In Limited's Favor.**

7           "Speculative injury cannot be the basis for a finding of irreparable harm."  *In re Excel*

8   *Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007); *see also* 11A Charles A. Wright & Arthur

9   R. Miller, *Federal Practice & Procedure* § 2948.1 (3d ed. 1998) ("Speculative injury is not

10  sufficient" to support a finding of irreparable harm.).  Thus, it is insufficient for a plaintiff seeking

11  injunctive relief to merely allege that it faces irreparable harm; rather, it must put forward facts

12  sufficient to show "that irreparable injury is *likely* in the absence of an injunction."  *Winter v. Nat.*

13  *Res. Def. Council*, 555 U.S. 7, 22 (2008).

14          When a plaintiff alleges that it will face irreparable harm if forced to continue defending

15  foreign litigation, courts will not issue an anti-suit injunction on the mere speculation that the

16  plaintiff *might* lose the foreign suit.  *See, e.g., Empresa Grenadora de Electricidad ITABO, S.A. v.*

17  *Corporacion Dominicana de Empresas Electricas Estatales*, 2005 WL 1705080, at *9 (S.D.N.Y.

18  July 18, 2005) (denying anti-suit injunction where the foreign court had not yet issued any adverse

19  rulings against the plaintiff); *Energy Capital Co. v. Caribbean Trading & Fidelity Corp.*, 1996 WL

20  157498, at *10 (S.D.N.Y. Apr. 4, 1996) (same).  Nor is a plaintiff entitled to an anti-suit injunction

21  to protect its arbitration rights if the party the plaintiff is seeking to enjoin was not a party to the

22  arbitration agreement.  *Comverse, Inc. v. Am. Telecomms., Inc.*, 2006 WL 3016315, at *6

23  (S.D.N.Y. Oct. 23, 2006) (denying anti-suit injunction where the injunction would have effectively

24  operated against a foreign prosecutor, who was not a party to the arbitration agreement).

25          It is also well established that a "defendant can rebut a plaintiff's argument of irreparable

26  harm by a showing that the moving party delayed in bringing its" request for injunctive relief, "the

27  rationale being that absent a good explanation, [the plaintiff] would promptly have sought an

28  injunction if it were being irreparably harmed."  *Open Text, S.A. v. Box, Inc.*, 36 F. Supp. 3d 885,

908-09 (N.D. Cal. 2014); *accord Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (en banc) (affirming denial of a preliminary injunction where the plaintiff waited four months after the onset of the supposedly irreparable harm to file for a preliminary injunction); *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070, 1090 (C.D. Cal. 1999) (collecting cases where delays of two to three months were held sufficient to rebut showing of irreparable harm), *aff'd*, 202 F.3d 278 (9th Cir. 1999).

For instance, in *Empresa Grenadora*, the court held that the plaintiff had failed to show irreparable harm and declined to issue an anti-suit injunction where the plaintiff had waited ten months after the commencement of the foreign proceeding and three months after its own arbitration demand to request injunctive relief, and where the foreign court had not yet made any adverse rulings against the plaintiff. 2005 WL 1705080, at *8-9. Similarly, in *Energy Capital*, the court denied an anti-suit injunction where the plaintiff waited a year after the commencement for foreign proceedings to request an injunction, and had also not yet suffered any adverse rulings on the merits. 1996 WL 157498, at *10. Finally, in *Comverse*, the court denied a request for an anti-suit injunction and held that the plaintiff was not irreparably harmed by the "deprivation of its contractual right to arbitrate its claims" because the entity the plaintiff was seeking to enjoin – a foreign prosecutor's office – was "not a party to the [contract] and so [was] not bound by the arbitration clause therein." 2006 WL 3016315, at *5-6.

Here, Apple likewise cannot show that any irreparable harm is *likely* if the Court declines to issue an anti-suit injunction. Indeed, any suggestion that Apple might be harmed by the Chinese Patent Litigation is pure speculation; to date, the Shenzhen Intermediate People's Court has not issued any rulings on the merits against Apple, nor could it do so in the near future, ***as Limited has discontinued the Chinese Patent Litigation***. (Etcheverry Decl. Exs. C-1 – C-2.) This fact alone should be dispositive; there is simply no likely harm – let alone irreparable harm – now that the Chinese Patent Litigation has been discontinued. Even were the Chinese Patent Litigation to be revived at some point in the future, Apple's irreparable harm argument would *still* be too speculative to merit relief, as Apple, like the plaintiffs in *Empresa Grenadora* and *Energy Capital*,

1  could still prevail in that action.[13]

2      The fact that Limited is not bound by the arbitration provision in the 2014 MDSA is

3  likewise dispositive.  Apple cannot be harmed by Limited's refusal to abide by an agreement it was

4  never bound to in the first place.  *Converse*, 2006 WL 3016315, at *6.  Further, Precision is ready

5  and willing to arbitrate any claims Apple has under the 2014 MDSA, so Apple is not being denied

6  anything.

7      Apple's inexplicable delay in bringing this Motion also belies its "Chicken Little"-esque

8  assertion that the sky will fall, and its entire supply chain will grind to a halt if Apple is denied an

9  anti-suit injunction.  Apple's Beijing subsidiary was served in connection with the Chinese Patent

10 Litigation on July 14, 2015 (Mot. 5 n.3), but Apple waited until October 29, 2015, ***three-and-a-***

11 ***half months later***, to bring its Petition here.  Surely, Apple would have shown more alacrity than it

12 did if it were actually facing "a potentially significant disruption in its supply chain, lost sales, and

13 unquantifiable damages to its reputation and goodwill with consumers and businesses that demand

14 Apple products."  (Mot. 16-17.)[14]  Apple's position is even more incredible when one considers

15 that it ***never once*** mentioned Limited's purported arbitration obligations in its multiple pleadings

16 before the Chinese courts.  (Etcheverry Decl. Exs. A-1 – B-2.)  Apple's conduct suggests that not

17 only are its assertions of harm overblown, but that Apple does not sincerely believe that Limited is

18 bound by the 2014 MDSA.  *See Rexnord, Inc. v. Laitram Corp.*, 628 F. Supp. 467, 474 (E.D. Wis.

19 1986) ("If defendants legitimately believe that they will 'go belly-up' by [the plaintiff's actions]

20 pending the trial, they would have sought legal relief earlier.  Indeed they would have hurried to

21

22 ───────────────
   [13]    Apple's assertion that the parties "understood the [irreparable] harm that would be inflicted
23 on Apple" is simply untrue.  (Mot. 17.) ████████████████████████████████████████
   ██████████████████████████████████████████████████████████████████████████████████
24 █████████████████████████████████████████

25 [14]    Apple also argues that, in the absence of an injunction, it will be "forced to bear the burden
   and expense of defending itself in litigation in China." (Mot. 16.)  "First, to the extent that the
26 [Chinese Patent Litigation] presents a threat of monetary injury to [Apple], such injury clearly does
   not constitute irreparable harm."  *Energy Capital*, 1996 WL 157498, at *10; *see also Hughes v.*
27 *United States*, 953 F.2d 531, 536 (9th Cir. 1992) ("[T]he claim of mere financial hardship does not
   establish irreparable harm.").  Second, Apple does not face any significant logistical hurdles in
28 defending against the Chinese Patent Litigation because the named defendants in that suit are
   Apple's Chinese subsidiaries and suppliers, which are already located in China.

───────────────
24

1  the Court to save their interests.  The Court believes that such failure to promptly commence a suit

2  is fatal to defendants' contention of irreparable harm.").

3        Finally, Apple's baseless claim that Limited will suffer "no harm" if an anti-suit injunction

4  issues is likewise inapposite.  (Mot. 18 (emphasis omitted).)  Courts have long recognized that

5  "because the principal value of a patent is its statutory right to exclude, the nature of the patent

6  grant weighs against holding that monetary damages will always suffice to make the patentee

7  whole."  *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1456-57 (Fed. Cir. 1988).  Thus, courts go

8  so far as to *presume* that a patent holder has been irreparably harmed whenever it makes a strong

9  showing of infringement.  *See, e.g.*, *id.*; *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d. 1058,

10  1066 (N.D. Cal. 2000).  By contrast, Apple, as an infringer, "can hardly claim to be harmed, since

11  it brought any and all difficulties occasioned by the [Chinese Patent Litigation] upon itself" by

12  violating Limited's patents.  *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197

13  (3d Cir. 1990) (holding the balance of the hardships favored issuing an injunction against a

14  trademark infringer).

15        In sum, here, any balance of the hardships tips decidedly in Limited's favor because it has

16  been, and will continue to be, irreparably harmed by Apple's and its suppliers' ongoing

17  infringement of its breakthrough SBID technology.  By contrast, Apple has suffered little, if any,

18  harm, let alone irreparable harm, from the Chinese Patent Litigation, and any harm to Apple is at

19  this point theoretical at best.

20                              **CONCLUSION**

21        For the foregoing reasons, this Court should deny Apple's request to compel arbitration

22  against Respondents and likewise deny Apple's request to enjoin Limited and Precision from

23  prosecuting the Chinese Patent Litigation, or any other litigation for that matter.

24  DATED: December 8, 2015

25                          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

26                          By: _____*/s/ Lance A. Etcheverry*_____
                                    LANCE A. ETCHEVERRY
27                                  Attorneys for Respondents
                            BYD PRECISION MANUFACTURING CO., LTD
28                             and BYD COMPANY LIMITED